[Civ. No. 40643. First Dist., Div. Three. Mar. 21, 1978.]

SAN JOSE PEACE OFFICER'S ASSOCIATION,
Plaintiff and Appellant, v.
CITY OF SAN JOSE et al., Defendants and Appellants.

936

**COUNSEL**

Carroll, Burdick & McDonough and Ronald Yank for Plaintiff and Appellant.

Peter G. Stone and Robert J. Logan, City Attorneys, and Richard K. Karren, Assistant City Attorney, for Defendants and Appellants.

## OPINION

**BROWN (I. A.), JR., J.**\*—Defendants City of San Jose, a chartered city, its city manager and its chief of police (hereinafter appellants) appeal from a judgment declaring that they must meet and confer with the San Jose Police Officer's Association (hereinafter respondent) before changing the portion of their use of force policy governing when a peace officer may discharge his firearm. Respondent has cross-appealed from the portion of the judgment refusing to award it attorney's fees. For the reasons hereinafter stated, we reverse the judgment of the trial court, except for the portion refusing to award respondent attorney's fees, as to which we affirm.

Respondent is a recognized employee organization within the meaning of the Meyers-Milias-Brown Act (hereinafter the MMBA), Government Code sections 3500-3510,[1] representing peace officers of the San Jose Police Department below the level of assistant chief.

Prior to the incidents involved herein, San Jose's police department adopted a regulation effective May 1, 1972, governing the circumstances under which a policeman would be permitted to discharge a firearm. As conceded by counsel for respondent during argument, this regulation was adopted unilaterally by the police department, and no request was made that the police department meet and confer with respondent with respect to its adoption. Said regulation provided as follows:

## "PART XI—USE OF FIREARMS

"*3111.1. Firearm Regulations.*

"*a. When Firearms May be Discharged.* Firearms may be discharged in the performance of a police duty only under the circumstances listed below.

"If, in the opinion of the officer involved, he can safely accomplish the ends described in (3), (4) and (5) by firing a warning shot or shots, he may do so.

---

\*Assigned by the Chairperson of the Judicial Council.

[1] All code references are to the Government Code unless otherwise indicated.

"(1) At an approved range.

"(2) When killing seriously wounded or dangerous animals when other disposition is impractical.

"(3) When necessary in the defense of his own life when all other reasonable means have failed.

"(4) When necessary in the defense of another person's life when all other reasonable means have failed.

"(5) When necessary to effect the capture of, or prevent the escape or rescue of a person whom the member has reasonable cause to believe has committed a felony involving the use or a threat to use deadly force, when all other reasonable means have failed.

"*b. When Firearms Will Not be Discharged.* Firearms will not be discharged under the following circumstances;

"(1) At misdemeanants.

"(2) To effect the capture or prevent the escape or rescue of a person whom the member has reasonable cause to believe has committed a felony which did not involve the use or a threat to use deadly force.

"(3) At moving or fleeing vehicles involved in violations of the Vehicle Code (including felony violations such as 20001, 10851, 23105) unless necessary to defend the life of the officer or another person.

"5/1/72"

Representatives of San Jose and respondent entered into a memorandum of understanding pursuant to the MMBA, covering the period July 1, 1972, through June 30, 1975. This memorandum of understanding was later adopted by San Jose's city council. On January 23, 1975, the chief of police issued a new policy governing the use of firearms. Appellants did not meet and confer with respondent before doing so. The policy of January 23, 1975, provided in part as follows:

## "BACKGROUND AND PURPOSE

" . . . . . . . . . . . . . . . . . .

". . . Thus, it is seen that our new policy is not a radical departure from the evolving standards, but rather it reflects some generally accepted values of our modern society and the criminal justice system; to wit, the use of deadly force is justifiable only as a means of preserving life. The discharge of firearms is never justifiable solely for the purpose of apprehension. It should be emphasized that there is nothing in this policy that prohibits police officers from protecting themselves or another person from a danger of death or of great bodily injury.

### "3111.1 *Definition of Deadly Force.*

" . . . . . . . . . . . . . . . . .

"*e. An honest and reasonable belief* is a judgment based on a set of circumstances that would cause a person of ordinary caution and prudence to reasonably entertain (have in mind) a strong suspicion amounting to a belief that a certain condition exists that requires the use of deadly force. In determining reasonableness, the officer should honestly believe (in fact entertain) certain conditions exist that require the use of deadly force. The judgment is not reasonable if the officer is negligent in surveying the facts or is negligent in acquiring any knowledge needed to understand the set of circumstances, the applicable laws, or the policies of his Department.

"The San Jose Police Department qualifies its members by periodic training as stated elsewhere in this policy and each officer must demonstrate the ability to understand laws and policies, analyze combat situations, and defend himself and others.

"f. *Force necessary to protect* is that force required to protect against a manifest peril to life or great bodily injury. Manifest peril occurs when there is a combination of time, space and reason to believe a perilous action will occur. There are three general situations of manifest peril involving these combinations which justify the use of deadly force:

"(1) Instant Peril—At this moment and this place, the officer has reason to believe that this person has the ability to kill or do great bodily injury and will do so.

"(2) Near Peril—At the next moment and in this place, the officer has reason to believe that this person will have the ability to kill or do great bodily injury and will do so.

"This place, as used in (1) and (2), is defined as that area in proximity to the officer in which he can, at this time, personally observe the activity of the person.

"(3) Foreboding Peril—At another time and in an unknown place, the officer has reason to believe that this person will have the capacity to kill or do great bodily harm and will do so because he has demonstrated a wanton disregard for human life.

"3111.2. *When deadly force may be used.* A police officer may use deadly force when all other reasonable means have failed and the officer honestly and reasonably believes that such force is necessary to protect himself or another person from death or great bodily injury.

"3111.3. *When firearms may be discharged.* A police officer may discharge a firearm:

"a. As provided in Section 3111.2.

"b. At a firing range pursuant to all safety rules and instructions.

"c. To kill seriously injured or dangerous animals when no other disposition is practical and the public safety is not jeopardized by the discharge."

On February 25, 1975, respondent's counsel sent a letter to the city manager alleging that respondent had not received a copy of the new policy until February 10, 1975, and requesting that San Jose meet and confer concerning the policy. On February 26, 1975, counsel wrote another letter stating that, having read the memorandum of understanding between San Jose and respondent, he was of the opinion that San Jose could only change the use of force policy if respondent was willing to meet and confer on the issue.

Thereafter respondent filed an action in superior court seeking a temporary restraining order and a preliminary and permanent injunction restraining appellants from giving effect to the new use of force policy until they met and conferred with respondent. Respondent also sought a judgment declaring that the use of force policy was a "meet and confer" item under the MMBA and the memorandum of understanding and that San Jose's unilateral action violated both the MMBA and the memorandum of understanding.

On March 7, 1975, the trial court issued a temporary restraining order granting the injunctive relief prayed for. On April 2, 1975, appellants answered the complaint and the chief of police withdrew the new use of force policy and reinstated the former policy. Following a trial to the court, the trial court rendered judgment for respondent and issued a permanent injunction which enjoined appellant from altering the 1972 use of force policy without meeting and conferring with respondent and from changing the 1972 use of force policy prior to June 30, 1975, without permission from respondent. The trial court further declared that the use of force policy regarding firearms was a mandatory subject of the meet and confer process under the MMBA. Finally the trial court denied respondent attorney's fees.

The principal issue presented by this appeal is whether appellants were required, under the MMBA, to notify respondent of the proposed change in the use of force policy and to meet and confer with respondent before changing that policy. Counsel have cited no controlling authority, and our own research has disclosed none. The issue appears to be one of first impression.

The MMBA applies to all local government employees in California. It provides for negotiation ("meet and confer") and mediation but not for fact finding or arbitration. (§§ 3505 and 3505.2.) "Meet and confer in good faith" is defined in section 3505 as exchanging information, opinions and proposals, and endeavoring "to reach an agreement on matters *within the scope of representation* . . . ." (Italics supplied.) Section 3504 defines the scope of representation as follows: "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity

provided by law or executive order." Respondent argues that the use of force policy relates to "terms and conditions of employment" and thus is within "the scope of representation." Appellants argue that the use of force policy relates to "the merits, necessity, or organization of any service or activity provided by law or executive order" and thus is without "the scope of representation."

The issue thus presented is a most delicate one requiring the resolution of significant competing considerations. Respondent argues that the 1975 use of force policy issued by appellants curtailed the situations under which an officer may pull his firearm and fire. Respondent further argues that the 1975 use of force policy subjected peace officers, and the citizenry in general, to greater danger because it limits the situations in which a firearm may be discharged to the firing range, to the killing of a seriously injured or dangerous animal, and to situations where deadly force is involved. The trial court so found in its findings of fact. Appellants argue that it is contrary to the MMBA and to public policy for the conditions under which a police officer may kill a person to be placed on the bargaining table, to be traded off against increases or decreases in wages, hours, and fringe benefits. Appellants further argue that the conditions under which a police officer may kill are a fundamental governmental prerogative, a management decision, the formulation of which should be left to the appropriate elected representatives of the people whose lives and safety are directly affected by such decisions.

In *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971], the leading case on the meaning and interpretation of the MMBA, the court examined the problem of "reconciling the two vague, seemingly overlapping phrases of the statute: 'wages, hours and working conditions,' which, broadly read could encompass practically any conceivable bargaining proposal; and 'merits, necessity or organization of any service' which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion." (*Id.* at p. 615.) The court pointed out that because of the similarities in language between the MMBA and the National Labor Relations Act (hereinafter the NLRA) (29 U.S.C. § 158(d)) federal precedents provide useful analogies in determining the parameters of the phrase "wages, hours and

other terms and conditions of employment." However, the court also explained: "The origin and meaning of the second phrase—excepting 'merits, necessity or organization' from the scope of bargaining—cannot claim so rich a background. Apparently the Legislature included the limiting language not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions." (P. 616.) The court further concluded, however, that "Although the NLRA does not contain specific wording comparable to the 'merits, necessity or organization' terminology in the city charter and the state act, the underlying fear that generated this language—that is, that wages, hours and working conditions could be expanded beyond reasonable boundaries to deprive an employer of his legitimate management prerogatives—lies imbedded in the federal precedents under the NLRA. As a review of federal case law in this field demonstrates, the trepidation that the union would extend its province into matters that should properly remain in the hands of employers has been incorporated into the interpretation of the scope of 'wages, hours and terms and conditions of employment.'[2] Thus, because the federal decisions effectively reflect the same interests as those that prompted the inclusion of the 'merits, necessity or organization' bargaining limitation in the charter provision and state act, the federal precedents provide reliable if analogous authority on the issue." (Pp. 616-617.)

One of the most often cited analyses of the federal standard is the concurring opinion of Mr. Justice Stewart in *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 223 [13 L.Ed.2d 233, 245, 85 S.Ct. 398, 6 A.L.R.3d 1130], which contains a careful and detailed discussion of the history of the NLRA and the limitations and exceptions in the term "working conditions" as that term applies in the private sector to employment security vis-à-vis entrepreneurial decisions. Mr. Justice Stewart said:

---

[2] "Thus federal cases have held an employer need not bargain about a decision to shut down one of its plants for economic reasons (*N.L.R.B.* v. *Royal Plating & Polishing Co.* (3d Cir. 1965) 350 F.2d 191), nor about a decision based on economic considerations alone to terminate its business and reinvest its capital in a different enterprise in another location as a minority partner (*N.L.R.B.* v. *Transmarine Navigation Corporation* (9th Cir. 1967) 380 F.2d 933). Furthermore, a decision to relocate the employer's plant to another location for economic reasons has been held 'clearly within the realm of managerial discretion' and not subject to bargaining on the union's demand (*N.L.R.B.* v. *Rapid Bindery, Inc.* (2d Cir. 1961) 293 F.2d 170, 176)." (Fn. by the court.)

"While employment security has thus properly been recognized in various circumstances as a condition of employment, it surely does not follow that every decision which may affect job security is a subject of compulsory collective bargaining. Many decisions made by management affect the job security of employees. Decisions concerning the volume and kind of advertising expenditures, product design, the manner of financing and sales, all may bear upon the security of the worker's jobs. Yet it is hardly conceivable that such decisions so involve 'conditions of employment' that they must be negotiated with the employees' bargaining representative.

"In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain, and this alone may be sufficient reason to conclude that such decisions are not 'with respect to . . . conditions of employment.' Yet there are other areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of the entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of §8(d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area." This concurring opinion has been cited with approval in *Chemical Workers* v. *Pittsburgh Glass* (1971) 404 U.S. 157, 180, fn. 19 [30 L.Ed.2d 341, 358, fn. 19, 92 S.Ct. 383]; *Seattle First National Bank* v. *N.L.R.B.* (9th Cir. 1971) 444 F.2d 30, 32, fn. 4; *N.L.R.B.* v. *Dixie Ohio Express Co.* (6th Cir. 1969) 409 F.2d 10; and *Westinghouse Electric Corporation* v. *N.L.R.B.* (4th Cir. 1967) 387 F.2d 542, 546.

In *Fire Fighters,* in its discussion of the union's proposal that more fire fighters be added, our Supreme Court shed some light on the considerations which govern the resolution of the issue in this case. The City of Vallejo argued that the level of manpower in the fire department was inevitably a matter of fire prevention policy, and thus not within the

scope of representation under the MMBA. The court commented that if the union's manpower proposal was aimed at maintaining a particular level of fire protection in the community, the city's argument would be well taken. The union argued, however, that the more firemen the city employed, the less the workload of each would be and that because of the hazardous nature of the job, the number of men available to fight a fire directly affected the safety of the firemen. The court pointed out that under federal decisions, questions of employee workload and safety are recognized as mandatory subjects of bargaining (*Fire Fighters, supra,* at pp. 619-620). The court disposed of the issue by sending the case to an arbitrator, pursuant to provision of the City of Vallejo Charter similar to the MMBA, to decide in the first instance whether the manpower question "*primarily* involves the workload and safety of the men ('wages, hours and working conditions') or the policy of fire prevention of the City ('merits, necessity or organization of any governmental service')." (Italics supplied.) (*Fire Fighters, supra,* at pp. 620-621.)

A similar test has been applied to cases arising under the NLRA by the Court of Appeals for the Ninth Circuit. In *Westinghouse Electric Corporation* v. *N.L.R.B.* (4th Cir. 1967) 387 F.2d 542, 548, the court said: "In the instant case we arrive at the conclusion, one which we believe is not inconsistent with past pronouncements of this court, that since practically every managerial decision has some impact on wages, hours, or other conditions of employment, the determination of which decisions are mandatory bargaining subjects must depend upon whether a given subject has a *significant or material relationship* to wages, hours, or other conditions of employment." (Italics supplied; Accord: *N.L.R.B.* v. *Ladish Co.* (7th Cir. 1976) 538 F.2d 1267, 1269-1270; *N. L. R. B.* v. *L. 264, Laborers' Intern. U., etc.* (8th Cir. 1976) 529 F.2d 778, 786; *Seattle First National Bank* v. *N. L. R. B.* (9th Cir. 1971) 444 F.2d 30, 32-33; and cases cited therein.) Requiring that the decision have a "significant or material" relationship to working conditions (*Westinghouse, supra*) is substantially the same as requiring that the decision "primarily" involve working conditions. (*Fire Fighters, supra.*) This is also consistent with Mr. Justice Stewart's opinion in *Fibreboard Corp., supra,* that decisions "which impinge only indirectly" upon a subject of bargaining are not the subject of collective bargaining.

It is undoubtedly true, as the trial court found, that a change in the use of force policy, particularly when such a change inhibits the ability of a police officer to fire at a suspected criminal, has some effect on the safety

of the police officer—clearly a term or condition of employment. It is equally true, however, that the use of force policy is as closely akin to a managerial decision as any decision can be in running a police department, surpassed only by the decision as to whether force will be used at all. While private managerial concepts do not translate easily to the public sector, we can imagine few decisions more "managerial" in nature than the one which involves the conditions under which an entity of the state will permit a human life to be taken. In a different context, involving issues of due process and equal protection rather than the MMBA, the Court of Appeal for the second district in *Long Beach Police Officers Assn. v. City of Long Beach* (1976) 61 Cal.App.3d 364, 371 [132 Cal.Rptr. 348], stated the following with respect to the adoption of a use of force policy: "The formulation of a policy governing use of deadly force by police officers is a heavy responsibility involving the delicate balancing of different interests: the protection of society from criminals, the protection of police officers' safety, and the preservation of all human life if possible. This delicate judgment is best exercised by the appropriate legislative and executive officers. The effort of the appropriate officials of the City of Long Beach to make that determination in the interests of its citizens and its police officers should be upheld if it is consistent with state law and constitutional standards."

It is, unfortunately, true that the job of a police officer is a dangerous one. The danger, however, is inherent in the calling; a police officer's situation is unique, and in today's world, oftentimes unenviable. Unlike the normal job in the private sector, or indeed, the job of a fire fighter, police work presents danger from third parties, rather than from dangerous working conditions. Thus the employer cannot eliminate safety problems merely by purchasing better equipment or by increasing the work force, as in *Fire Fighters.* The danger posed to a police officer by a suspected criminal must be balanced against difficult considerations of when an escaping criminal should pay the price of death for ignoring a peace officer's command to stop. Viewed in this context, the safety of the policeman, as important as it is, is so inextricably interwoven with important policy considerations relating to basic concepts of the entire system of criminal justice that we cannot say that the use of force policy concerns "primarily" a matter of wages, hours or working conditions.

It is important to note that San Jose's 1975 use of force policy does not restrict a police officer's right to defend himself from the threat of great bodily harm. The danger presented is an indirect one, in that a suspect

who is able to escape because the police officer is not permitted to discharge his firearm in capturing the suspect, may later harm the police officer. While expressing no opinion as to the wisdom of such a decision by appellants, we observe that any such danger obviously extends equally as much to the public at large as it does to the individual police officer. Such an effect on public safety lends further support to our conclusion that the use of force policy is primarily a matter of public safety and therefore not a subject of meeting and conferring under the MMBA. While the policy may impinge on a condition of employment, it impinges only indirectly.

■ The power of a city to enact and enforce regulations relating to the use of firearms by police officers is in the exercise of the police power granted by article XI, section 7 of the California Constitution (*Long Beach Police Officers Assn.* v. *City of Long Beach, supra,* at p. 372). A governmental agency may not suspend, bargain or contract away its police power. (*Ex Parte Young* (1908) 154 Cal. 317, 324 [97 P. 822]; *Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464, 475 [93 P. 70], affd. 216 U.S. 358 [54 L.Ed. 515, 30 S.Ct. 301]; *Sloane* v. *Hammond* (1927) 81 Cal.App. 590, 602-603 [254 P. 648]; *Maguire* v. *Reardon* (1919) 41 Cal.App. 596, 602 [183 P. 303], affd. 255 U.S. 271 [65 L.Ed. 625, 41 S.Ct. 255].)

Respondent argues correctly that appellants are not required to come to an agreement with respondent on the use of force policy, but only to negotiate the policy. (Gov. Code, § 3505; *Los Angeles County Employees Assn., Local 660* v. *County of Los Angeles* (1973) 33 Cal.App.3d 1, 8 [108 Cal.Rptr. 625].) However, the MMBA does require the parties to meet and confer in good faith and "endeavor to reach an agreement" (§ 3505) on matters which are within the scope of representation. In *National Labor Relations Bd.* v. *Highland Park Mfg. Co.* (4th Cir. 1940) 110 F.2d 632, 637, the federal court construed similar language in the NLRA as follows: "The act, it is true, does not require that the parties agree; but it does require that they negotiate in good faith with the view of reaching an agreement if possible, and mere discussion with the representatives of employees, with a fixed resolve on the part of employer not to enter into an agreement with them, even as to matters as to which there is no disagreement, does not satisfy its provisions." (See also *Westinghouse Electric Corporation* v. *N. L. R. B., supra,* 387 F.2d 542, and *Labor Board* v. *American Ins. Co.* (1951) 343 U.S. 395 [96 L.Ed. 1027, 72 S.Ct. 824].)

The real vice in respondent's position is demonstrated by its argument in its post-trial brief to the trial court. There, in arguing that the trial court should grant declaratory relief as a guide for the parties' future conduct, respondent said: "Here both parties should know while they're carrying on meet and confer sessions whether or not they are bound to negotiate the gun policy if same is brought up, *whether or not they should bring it up as a possible exchange for favor or concession by the other side,* and the like. That is, the parties will more effectively be able to carry on negotiations if they have a judicial determination of the negotiability of a gun policy; *they should not, at least in part, have to base negotiating strategies and postures on the possible outcome of a suit* to be brought when and if the City refuses to negotiate on a gun policy and/or attempts unilaterally to change the policy again." (Italics supplied.) The forum of the bargaining table with its postures, strategies, trade-offs, modifications and compromises (*Glendale City Employees' Assn.* v. *City of Glendale* (1975) 15 Cal.3d 328, 340 [124 Cal.Rptr. 513, 540 P.2d 609], cert. den., 424 U.S. 943 [47 L.Ed.2d 349, 96 S.Ct. 1411]) is no place for the "delicate balancing of different interests: the protection of society from criminals, the protection of police officers' safety, and the preservation of all human life, if possible." (*Long Beach Police Officers Assn.* v. *City of Long Beach, supra,* 61 Cal.App.3d at p. 371.)

■ We conclude that San Jose's use of force policy falls within the exception delineated in section 3504. Respondent in fact challenged the merits or necessity of a "service or activity provided by law or executive order " (§ 3504), i.e., the policy of when and under what circumstances San Jose will permit a human life to be taken. This policy clearly constitutes a managerial decision which is not properly within the scope of union representation and collective bargaining. As our Supreme Court has pointed out, the analogous federal precedents have established substantive limitations upon the extent to which "working conditions" may be defined under the NLRA, so that decisions which are plainly within the realm of managerial discretion are excluded from the meet and confer requirements of the MMBA (see *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d at pp. 616-617). As stated in *N. L. R. B.* v. *Transmarine Navigation Corporation* (9th Cir. 1967) 380 F.2d 933, 939: "A decision of such fundamental importance as to the basic direction of the corporate enterprise is not included within the area of mandatory collective bargaining." This is consistent with the language in *Long Beach Police Officers Assn.* v. *City of Long Beach, supra,* 61 Cal.App.3d at page 371, that the heavy responsibility and delicate balancing of the

different interests referred to above, involved in a use of force policy, are best exercised by the appropriate legislative and executive officers, who are then directly responsible to the people for such decisions.

Our conclusion that San Jose's use of force policy is not within "the scope of representation" of the MMBA makes it unnecessary for us to address other arguments raised by respondent.

We do direct our attention, however, to respondent's argument that any unilateral change in the 1972 use of force policy was a violation of section 6.00(d) of the memorandum of understanding between the parties. This argument is patently incorrect, as are the related findings and conclusions of the trial court on this issue. Section 4.01 of the memorandum of understanding, entitled "Management Rights" provides as follows:

"4.01 *Management Rights.*

"The parties agree that no provision of the Memorandum of Understanding shall be construed so as to ~~recommend~~ mean that any right vested in the City Council or in the Management of the City by Law, by the City Charter ~~or inherent in the obligation to manage an enterprise~~ be abrogated, suspended, or impaired and more specifically including but not limited to the following:

"a. The right to determine the organization and mission of the City, its Departments, agencies, and units.

"b. The right to determine the merits, necessity, or organization of any service or activity of the City." Since we have concluded that the use of force policy relates to "the merits, necessity, or organization of any service or activity of the City," San Jose's right to change such policy unilaterally is not abrogated, suspended, or impaired by the memorandum of understanding.

In view of the conclusions expressed herein, respondent is not the prevailing party and is not entitled, on its cross-appeal to a reversal of the trial court's order refusing to award it attorney's fees.

The judgment of the trial court is reversed, with directions to enter judgment for appellants. The portion of the judgment refusing to award respondent attorney's fees is affirmed.

Scott, Acting P. J., and Smith, J.,* concurred.

A petition for a rehearing was denied April 20, 1978, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied June 1, 1978. Bird, C. J., did not participate therein.

*Assigned by the Chairperson of the Judicial Council.