54 Cal.Rptr.3d 167 (2007)
147 Cal.App.4th 311
SACRAMENTO POLICE OFFICERS ASSOCIATION, Plaintiff and Appellant,
v.
CITY OF SACRAMENTO et al., Defendants and Appellants.
Nos. C042493, C043377.
Court of Appeal of California, Third District.
January 31, 2007.
*168 Mastagni, Holstedt & Amick, Kasey Christopher Clark, David E. Mastagni and Adam J. Krolikowski, for Plaintiff and Appellant.
*169 Samuel L. Jackson, City Attorney, Deborah R. Schulte, Senior Deputy City Attorney, for Defendants and Appellants.
Renne Sloan Holtzman & Sakai, Jeffrey Sloan, Felicia R. Reid and Charles D. Sakai, San Francisco, for League of California Cities as Amicus Curiae on behalf of Defendants and Appellants.

OPINION ON REMAND
DAVIS, J.
At the behest of the plaintiff, Sacramento Police Officers Association (SPOA), the superior court issued a writ of mandate directing the defendants, City of Sacramento and Sacramento Police Department (collectively City), to "meet and confer"[1] about the implementation of a policy to hire retirees as temporary noncareer employees to remedy a short-term staffing shortage in its police department. The superior court denied the request of the plaintiff for reimbursement of its legal fees.
The parties cross-appealed. We consolidated the appeals for the purpose of consideration and argument.
We conclude that the proposal to hire annuitants in response to an abrupt shortage in the staffing of the police force, which could not be remedied through the ordinary processes of recruitment and hiring, is a fundamental managerial policy decision designed to maintain the existing level of public safety in the community. It thus was not itself subject to the City's duty to meet and confer even if it represented a change in the status quo with respect to the terms and conditions of employment. As the proposal included the principle that nothing in its implementation was to affect the terms and conditions of employment of unit members, the details of implementation were not subject to the duty to meet and confer. If individual unit members nonetheless experienced detriment as a result of the proposal's implementation, these would have been properly subject to the existing grievance process. We thus shall reverse in case No. C042493, and dismiss the appeal as moot in case No. C043377.

BACKGROUND
SPOA is the recognized employee representative[2] for assorted classifications in the City police force. The negotiations over the terms of the June 2001-June 2005 memorandum of understanding (MOU)[3] resulted in binding arbitration pursuant to Article XVIII of the City Charter (a SPOA-sponsored and voter-enacted 1996 provision). Among the benefits that the arbitrator awarded was significantly enhanced retirement pay, effective July 2002, which would allow retirement at age 50 with a pension calculated as the multiple of an employee's years of service and 3 percent (up to a maximum of 90 percent).
The parties expected that this jump in pension payments would generate a spike in retirements (which was the reason for the delayed effective date). The police department had already been operating with fewer than its full complement of authorized positions; effective July 2002, 44 more members of the force retired. By September 2002, there was a shortage of *170 nearly 16 percent (or 92 positions) in the authorized staffing for rank-and-file police officers.
The Sacramento region has a tight "labor" market for law enforcement officers, with the various agencies competing to recruit laterals and new hires, or to retain existing personnel. Immediately after the award of increased retirement benefits, the City authorized art additional $500,000 for recruitment efforts. However, unlike normal job markets, there is a lag time between identifying the need for further personnel and the availability of new hires, because a successful applicant must then attend a 23-week training academy (which the Sacramento Police Department can normally conduct twice per year with 25 cadets each). The first 2002 academy graduated 20 cadets in June; the second anticipated 30 graduates in December. The City also scheduled three academies that would conclude in 2003. By virtue of these five academies, the City expected authorized staffing to exceed 100 percent by December 2003.
In anticipation of the retirement spike, the City had spoken with SPOA about using retirees as part-time, noncareer, limited-term employees (as authorized under sections 5.4(a) and 6.9(b)(2) of the rules of its civil service system) to fill the vacancies until the police department could replenish with new recruits. The City forestalled SPOA's inquiries about this proposal pending the development of a citywide classification of retiree hires. The City initiated meet-and-confer sessions regarding the proposal for a new citywide classification in April-May 2002; in the face of unanimous opposition from its employee organizations, the City withdrew the proposal and left in place the procedures for its various departments individually to appoint part-time, noncareer employees for terms of no more than 960 hours. In the memorandum to departmental management, the City expressly noted that the use of retirees "shall not be used to circumvent the civil service system or labor agreements. Retirees shall not normally be included in minimum staffing where required, except for the purpose of backfilling regularly scheduled staffing." SPOA demanded that the City submit the issue to binding arbitration.
In July 2002, the City's personnel director prepared a memorandum for the City Council (Council) in support of a resolution on the issue of police staffing. By this time, five police retirees had applied for the noncareer limited-term appointments. She asked the Council to amend the budget authority of the city manager to allow for the appointment of retirees to the police force until the completion of the scheduled academies in 18 months. She also asked the Council to adopt "administrative principles" that "use of retirees at this time is not to save money, block promotional opportunities[,] or eliminate acting assignments," consistent with the City's commitment "to insure that such rehires do not create significant adverse impacts on career employees." The Council enacted the requested resolution at its July 30 meeting, citing the need to provide a level of staffing necessary for the public safety until December 2003. SPOA filed the present petition (in apparent anticipation of this official action) on July 24.
SPOA submitted a declaration with its reply in September 2002 that recounted several anecdotal examples of the City's use of retirees. SPOA claimed that in each instance retirees had displaced unit members from acting assignments in specialty and supervisory positions, or had interfered with seniority rights. The City did not contradict the substance of these allegations; after attempting unsuccessfully to exclude the declaration on various *171 evidentiary grounds, the City suggested that if there were such instances, they could be addressed appropriately through filing grievances.
In its ruling, the trial court asserted the City had a duty to meet and confer before putting the retiree resolution into effect. The policy represented a change in the status quo, as the City admitted it had never before used retirees to fill a vacancy in a sworn position in the unit. The policy affected the working conditions of unit members, because it limited overtime and the opportunity to work in an acting capacity in specialty and supervisory positions (which in turn could limit promotional opportunities). The court declined to give any weight to the City's claim of an exigent need to respond to staffing shortages; it unaccountably found that the decision to appoint retirees to positions for which lateral or cadets were otherwise unavailable did not constitute a review of the level of public protection, and the independent arbitrator's award of heightened inducements to retire in June 2001 provided enough time for the City to have prepared for the shortage.

DISCUSSION

I. C042493

A
Public agencies, as noted above, have the obligation under section 3505 to meet and confer (in place of which we will use the more succinct term "bargain") about any proposed change in the status quo regarding the terms and conditions of employment if the change is within the scope of representation as defined in section 3504. Determining the ambit of this obligation is not as simple as it might seem.
As an initial matter, the change in the status quo must have a significant impact on the terms and conditions of employment, either through adverse effects on specific employees or through a departure from established past practice. (Claremont Police Officers Assn. v. City of Claremont (2006) 39 Cal.4th 623, 631, 47 Cal.Rptr.3d 69, 139 P.3d 532 (Claremont Police Officers); Building Material & Construction Teamsters' Union v. Farrell (1986) 41 Cal.3d 651, 659, 224 Cal.Rptr. 688, 715 P.2d 648 (Farrell); Riverside Sheriffs Assn. v. County of Riverside (2003) 106 Cal.App.4th 1285, 1290, 131 Cal. Rptr.2d 454 (Riverside Sheriff's Assn.).) The party claiming a departure from past practice has the burden of proving the existence of an unequivocal and clearly enunciated policy, which both parties accepted as binding over a reasonable period of time. (Riverside Sheriff's Assn., supra, 106 Cal.App.4th at p. 1291, 131 Cal.Rptr.2d 454.) In the trial court, the parties disputed whether any members of the SPOA unit in fact experienced detrimental impacts from the nascent retiree program. SPOA also asserted that the appointment of retirees to positions in its unit departs from past practice, while the City argued that its present proposal is consistent with a practice of appointing retirees to civilian positions in the unit. Rather than resolve these disputes on the anecdotal evidence adduced in the trial court (especially as the parties do not focus on these issues on appeal), we will assume that the retiree proposal represents a change in the status quo and simply proceed to their primary argument regarding the limits of the scope of representation.[4]
*172 Section 3504 includes "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment" within the scope of representation. However, section 3504 expressly excludes "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." These principles are arguably "vague" and "overlapping"; we thus must not read either too broadly, because each could swallow the entirety of the other. (Claremont Police Officers, supra, 39 Cal.4th at p. 631, 47 Cal.Rptr.3d 69, 139 P.3d 532; Fire Fighters Union v. City of Vallejo (1974) 12 Cal.3d 608, 615, 116 Cal.Rptr. 507, 526 P.2d 971 (Fire Fighters Union).)
As section 3504 tracks the National Labor Relations Act (NLRA) and court decisions limiting the scope thereunder of a private employer's obligation to bargain, it is generally proper to cite federal precedent (Farrell, supra, 41 Cal.3d at p. 658 & fn. 2, 224 Cal.Rptr. 688, 715 P.2d 648 [which also suggests in dictum that duty to bargain might be broader under MMB Act than under NLRA]), and consequently many if not all of the cases decided under the MMB Act have federal foundations. It is not always easy, however, to translate from the private to the public sector. (San Jose Peace Officer's Assn. v. City of San Jose (1978) 78 Cal.App.3d 935, 946, 144 Cal.Rptr. 638 (San Jose Peace Officer's Assn.).)
Farrell describes the exception in section 3504 to the scope of representation as carving out space for fundamental managerial policy decisions that involve matters at the core of management control of the basic direction of an enterprise. (41 Cal.3d at pp. 660, 663, 224 Cal.Rptr. 688, 715 P.2d 648.) Although there can be a duty to bargain about the details of implementing a fundamental managerial decision, the decision itself is not subject to the bargaining process unless the benefit of improved labor relations flowing from the bargaining process outweighs the need for unfettered management decisionmaking and the transactional cost of bargaining. (Ibid.; Claremont Police Officers, supra, 39 Cal.4th at pp. 628, 638, 47 Cal.Rptr.3d 69, 139 P.3d 532; Fire Fighters Union, supra, 12 Cal.3d at p. 621, 116 Cal.Rptr. 507, 526 P.2d 971; State Assn. of Real Property Agents v. State Personnel Bd. (1978) 83 Cal.App.3d 206, 213, 147 Cal. Rptr. 786 (Real Property Agents); San Jose Peace Officer's Assn., supra, 78 Cal. App.3d at p. 944, 144 Cal.Rptr. 638.)[5]

B
The City contends that SPOA and the trial court intruded into one of the most fundamental management prerogatives in the public sectorthe manner of responding expeditiously to a labor market shortage in a department affecting the public safety. We agree.
The analysis of whether changes in the status quo represent fundamental managerial policy decisions generally tends not to articulate the specific criteria guiding its conclusion, and instead represents axiomatic declarations. As a result, we must extract what principles we can from the *173 following digest of authority derived from the parties' briefing.
Several cases involve the reduction of work available to unit personnel. Fire Fighters Uniona largely advisory opinion for the guidance of subsequent arbitration pursuant to city charter provisions paralleling the MMB Act (12 Cal.3d at p. 614 & fn. 5, 116 Cal.Rptr. 507, 526 P.2d 971)suggested that the issue of selecting a particular standard for fire prevention in a community (including the number of fire stations or amount of equipment) involves fundamental management policy decisions, unless staffing is decreased to a point that the individual workloads are increased or safety is threatened. (Id. at pp. 619-622, 116 Cal.Rptr. 507, 526 P.2d 971.) It also pointed out that under the NLRA, a reduction in workforce involving the transfer of existing work to personnel outside the unit is subject to bargaining. (Id. at p. 621, 116 Cal.Rptr. 507, 526 P.2d 971.) Citing Fire Fighters Union and NLRA precedent, Real Property Agents readily found that a decision to reduce a workforce in the face of budgetary restrictions implicated fundamental management policy (the effects of which the agency had adequately addressed in bargaining). (83 Cal.App.3d at pp. 212-213, 147 Cal.Rptr. 786.) On the other hand, Dublin Professional Fire Fighters, Local 1885 v. Valley Community Services Dist. (1975) 45 Cal.App.3d 116, 119 Cal.Rptr. 182 (Dublin Fire Fighters) had no trouble concluding that reassignment of overtime to temporary personnel outside the work unit was not a fundamental management policy decision and was therefore subject to bargaining. (Id. at pp. 118-119, 119 Cal.Rptr. 182.) Farrell returned to the context posited in Fire Fighters Union and akin to that in Dublin Fire Fighters, in which a public agency made the decision to transfer work to personnel outside the work unit and reduce staff in the work unit as a result. (41 Cal.3d at p. 655, 224 Cal.Rptr. 688, 715 P.2d 648.) Farrell held this choice could not be considered a fundamental management policy decision because it did not relate to any choice about the level of service provided to the public: it merely reallocated the work required to staff an existing level of service. (Id. at p. 664, 224 Cal.Rptr. 688, 715 P.2d 648.) These cases are instructive primarily to the extent they define a context that is opposite to the present: removing work from a bargaining unit with available personnel.
There are also several MMB Act cases that find noneconomic policy changes to be fundamental managerial policy decisions. (Claremont Police Officers, supra, 39 Cal.4th at pp. 632-633, 47 Cal.Rptr.3d 69, 139 P.3d 532 [parties agree no duty to bargain over decision to collect data on issue of racial profiling in traffic stops]; San Jose Peace Officer's Assn., supra, 78 Cal.App.3d at p. 946, 144 Cal.Rptr. 638 [no duty to bargain over policy prescribing police use of firearms]; Berkeley Police Assn. v. City of Berkeley (1977) 76 Cal. App.3d 931, 937, 143 Cal.Rptr. 255 [no duty to bargain over decision to improve community relations through allowing members of citizen and police inquiry boards to attend each other's meetings].) Although the parties bat these cases back and forth, there is little guidance that we can derive from them for the present dispute, because they resolve the abstract MMB principles in a context other than unit workload.
At the risk of being an additional example of "ruling from the gut" in this area of jurisprudence, it is readily apparent to us that the trial court erred. It both overstepped its bounds in its disregard of the findings of the local legislative body, and mechanically applied the concept of subcontracting unit work without considering the nuances of the specific factual context.
*174 First, it ill-behooved the trial court to reject the City's claim that urgency underlay its plan to make use of retirees. The evidence in this case demonstrated that the greatly enhanced retirement benefits which triggered the surge in retirements were the product of binding arbitration beyond the City's control (an inherently flawed process in the context of the public fisc that would be unconstitutional if the Legislature had imposed it on the City (County of Riverside v. Superior Court (2003) 30 Cal.4th 278, 132 Cal.Rptr.2d 713, 66 P.3d 718) rather than being the local voters' self-inflicted wound). The exact magnitude of the surge could not be foretold a year in advance, and the City responded as expeditiously as it could with extra recruitments and training academies.
Second, the superior court incorrectly concluded that the retiree plan was not the product of any review of the level of community police services. The authorized staffing for the police force represents the legislative determination of the proper feasible degree of protection for the City's residents. The retiree plan was the means by which the City sought to reach that goal under the circumstances in effect from July 2002 to December 2003, rather than allow the level of protection to erode during that period.
Finally, the conditions in the present case are not apposite to Farrell or Dublin Fire Fighters, because it did not involve a decision to reallocate work from unit members to other personnel outside the unit. Rather, there was a shortage that could not otherwise be filled with unit members. In focusing on SPOA's anecdotal claims of displaced unit members in order to bring the City within Farrell's pigeonhole, the superior court overlooked the express administrative principles included in the memorandum from the City's personnel director to the Council in support of the resolution endorsing the retiree policy. Unless the superior court was making an implicit finding of mendacity on the personnel director's part, the policy included administrative protections against the blocking of promotional opportunities or elimination of acting assignments, and the commitment to prevent significant adverse impacts on career employees from the use of the noncareer retirees. Thus, nothing about the decision to appoint retirees or its planned consequences resulted in the reallocation of work opportunities away from unit members. If indeed SPOA is correct that the execution of this policy in fact resulted in detriment to individual unit members, then the proper procedure would have been to file grievances pursuant to the existing MOU (as augmented with the City's retiree policy and its administrative principles), not to compel the City to engage in the bargaining process over effects contrary to the City's stated policy. We conclude that the City's decision to use retirees to respond to a short-term staffing shortage in a work force concerned with public protection involves a question of fundamental managerial policy that neither SPOA nor the trial court were entitled to second-guess. As in Claremont Police Officers, this speculative assertion of possible impacts from the implementation of this managerial policy is insufficient to trigger a duty to bargain with SPOA over its enactment. (39 Cal.4th at pp. 634, 638-639, 47 Cal.Rptr.3d 69, 139 P.3d 532.) Moreover, even if SPOA had marshalled evidence of a significant impact on working conditions, this shortage was beyond the power of SPOA to remedy (other than through overtime to the limits of human endurance, a remedy itself fraught with danger to public safety). (City of Santa Ana v. Santa Ana Police Benevolent Assn. (1989) 207 Cal.App.3d 1568, 1573, 255 Cal. Rptr. 688.) As a result, there is no benefit in subjecting the decision to the bargaining *175 process that outweighs the City's interest in unfettered decisionmaking or the transactional cost of the bargaining process. (See Dorsey Trailers, supra, 134 F.3d at p. 131.)
The City asserts that even if technically moot due to the passage of time, a resolution of this matter is important in the event of a future short-term shortage of police (or other personnel who protect the public safety) as the result of unforeseen circumstances, which may again be too brief in duration to allow for effective appellate review. (Chantiles v. Lake Forest II Master Homeowners Assn. (1995) 37 Cal.App.4th 914, 921, 45 Cal.Rptr.2d 1.) Consequently, we will reverse the judgment of the trial court with directions to enter a new judgment denying SPOA's petition in its entirety.

II. C043377
The trial court denied SPOA's motion to recover its legal fees under the "private attorney general" statute (Code Civ. Proc, § 1021.5) as the successful litigant. It concluded that the litigation neither conferred a significant benefit beyond the immediate context of the SPOA membership during a singular staffing shortage, nor imposed a financial burden on the part of SPOA out of proportion to its stake in the matter. (See Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors (2000) 79 Cal.App.4th 505, 511, 94 Cal.Rptr.2d 205.)
SPOA appeals from this postjudgment order. However, as SPOA is no longer the successful litigant, it is not entitled to recovery of its legal fees under the statute. (Schmier v. Supreme Court (2002) 96 Cal. App.4th 873, 877, 117 Cal.Rptr.2d 497.) We thus dismiss this appeal as moot.

DISPOSITION
The judgment in case No. C042493 is reversed and remanded; the trial court is directed to enter judgment for the City. The appeal in case No. C043377 is dismissed as moot. The City shall recover its costs in both appeals.
SCOTLAND, P.J., and SIMS, J., concur.
NOTES
[1] This is the statutory term of art in the Meyers-Milias-Brown Act, or "MMB Act" (Gov. Code, § 3500 et seq. [undesignated section references will be to this code]), which obligates local agencies to negotiate in good faith with employee organizations before changing the status quo regarding terms and conditions of employment properly within the scope of representation. (§§ 3504, 3505.)
[2] Section 3501, subdivision (a).
[3] Section 3505.1.
[4] We thus need not address the argument of amicus curiae League of California Cities that there cannot be a departure from past practice because the City had general authority under its civil service rules to appoint retirees to any position, which the MOU did not derogate. (Eggert v. Pacific States S. & L. Co. (1943) 57 Cal.App.2d 239, 251, 136 P.2d 822.)
[5] This parallels the NLRA. A managerial policy decision that involves the economic viability or the scope and direction of an entity is not subject to bargaining even if it directly affects the terms and conditions of employment unless factors underlying it are within the control of the employee organization, in which case the benefit of subjecting the decision to the bargaining process outweighs the interest in managerial autonomy. (Dorsey Trailers, Inc. v. N.L.R.B. (3d Cir. 1998) 134 F.3d 125, 131 (Dorsey Trailers).)