[No. F012743. Fifth Dist. Apr. 18, 1991.]

JERRY ALLEN HOLLIDAY, Plaintiff and Appellant, v.
CITY OF MODESTO et al., Defendants and Respondents.

[Opinion certified for partial publication.†]

---

† Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III, and IV.

COUNSEL

Davis, Reno & Courtney, Alan C. Davis, Diane Ravnik and Cindy O'Hara-Varela for Plaintiff and Appellant.

Stan T. Yamamoto, City Attorney, Thomas J. Quinlan and Michael Milich, Deputy City Attorneys, for Defendants and Respondents.

OPINION

THAXTER, J.—May a public employer order one of its employees, on pain of suspension, demotion, or termination, to submit to drug testing without first complying with the "meet and confer" requirements of the Meyers-Milias-Brown Act (Gov. Code,[1] § 3500 et seq., hereinafter MMBA)? Under the circumstances of this case, we answer the question no.

### SUMMARY OF FACTS AND PROCEDURAL HISTORY

Appellant Jerry Allen Holliday concedes there is no factual dispute on appeal.

Holliday was a fire lieutenant with the City of Modesto, having been employed with the fire department for some 18 years. His past performance had been excellent.

On the evening of February 25, 1987, Holliday and fellow fire Lieutenant Bernard Ferris Cudney[2] were each cited by Modesto police officers for

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] Cudney was a party to the proceedings below and originally joined in the appeal. Pursuant to a written stipulation of the parties, we dismissed Cudney's appeal by order filed April 18, 1990. Holliday is now the sole appellant.

misdemeanor possession of marijuana (Health & Saf. Code, § 11357, subd. (b)); they had been observed smoking a marijuana cigarette in the parking lot of a bar. Cudney had supplied the marijuana. Neither Holliday nor Cudney was on duty at the time. Holliday worked a full 24-hour shift in a normal manner beginning at 7 a.m. the following day.

On February 26, 1987, Fire Chief Laurence Sheldon learned of the incident. Without consulting anyone else, Chief Sheldon issued a memorandum to Holliday advising him that the incident "constitutes a violation of Modesto Fire Department Rules and Regulations, F.R. 213(f), 'Members of the department shall not use drugs or narcotics whose use or possession would be illegal, unless such drugs or narcotics are properly prescribed by a physician for an illness or injury.'" The memo further advised Holliday that before returning to work he would have to provide either a letter from a doctor stating that the marijuana had been medically prescribed or "medical results of a drug test conducted under the guidance of a licensed physician." Holliday was advised that the purpose of the drug test was to ensure his ability to perform his function as fire lieutenant and that the drug test must include an evaluation by the physician as to his ability to properly perform his job requirements, taking into account the drug test results. Finally, Holliday was directed to attend an investigative board hearing on March 3, 1987, "to determine if disciplinary action should be taken regarding this matter. . . . Their recommendations will be considered by this office prior to final disposition of this matter."

Holliday appeared as directed before the investigative board. He was asked three questions: (1) Do you want to tell us what happened that night?; (2) Have you submitted to a drug test?; and (3) Will you be willing to prepare written statements of the events that led to your being cited on February 25 prior to leaving the building today? Holliday answered each of the questions in the negative. He answered no to questions (1) and (3) because he had not had an opportunity to speak with a lawyer, he did not think he had to discuss his personal business even though he knew that possession of marijuana was a violation of department regulations, the investigative board was a new procedure for which he was unprepared, and he feared the consequences of speaking to the board.

After the hearing, Chief Sheldon sent Holliday a letter dated March 3, informing him that he would be suspended without pay until such time as Holliday complied with Chief Sheldon's drug-test directive of February 27 to ensure his ability to perform.

Holliday failed to comply with the February 27 and March 3 directives, and Chief Sheldon directed that his pay be discontinued effective

immediately, leaving other benefits intact. On March 16, 1987, operations officer Thurman Norton wrote to Holliday informing him that he intended to recommend Holliday's dismissal effective March 31, 1987. Stated grounds included: (1) violation of fire department rule FR 258 ("Employees shall obey the lawful orders of a superior officer at all times"), in that Holliday failed to obey Chief Sheldon's orders of February 27 and March 3; (2) violation of rule FR 212 ("Employees, whether on duty or off duty, . . . shall commit no act which [would] bring reproach or discredit upon the Fire Department"); (3) violation of rule FR 106 ("An employee . . . who is in violation of any fire regulation or order, may receive appropriate discipline, such as reprimand, demotion, reduction in salary, or discharge"); and (4) violation of rule FR 213(f) ("Members of the Department shall not use drugs or narcotics whose use or possession would be illegal, unless such drugs or narcotics are properly prescribed by a physician for an illness or injury"). Norton went on to advise Holliday of his right to respond by March 30, and his right to appeal any disciplinary action pursuant to Modesto Municipal Code section 2-5.12.

On March 25, 1987, Holliday's union president, Captain Ronald Mendoza, requested that Chief Sheldon extend the response deadline to April 1 and arranged for a meeting on that date. On March 26, 1987, Chief Sheldon received from Mendoza a report from Dr. William Broderick dated March 23 and stating that "JERRY HOLLIDAY WAS EXAMINED BY ME TODAY AND THE RESULTS REVEALED NO EVIDENCE OF ANY HEALTH OR DRUG PROBLEMS. [¶] HE HAS THE ABILITY TO PROPERLY PERFORM THE REQUIRED FUNCTIONS OF HIS POSITION AS A LT. OF THE MODESTO FIRE DEPT." Chief Sheldon accepted this as the required drug test report without knowing that no actual chemical drug test had been performed.

On March 30, 1987, Holliday took a urine test for illegal drugs, and tested "clean." He never presented those results to Chief Sheldon.

At the April 1 meeting, Chief Sheldon made no further inquiry regarding drug testing, and Holliday did not volunteer the results from his urine test of the previous day as they had not yet come in. After the hearing Sheldon rejected the proposed termination, instead returning him to the payroll as of April 2, demoting him two ranks (to firefighter), and requiring him to submit to drug testing "twice per calendar year beginning 7/1/87 and concluding 12/31/89."

Holliday appealed the disciplinary order and on January 6, 1988, the hearing officer issued his findings and conclusions. He found that Holliday had violated department rule FR 213(f) by using marijuana while off duty, and that rule FR 213(f) was valid. He found that such marijuana use also

violated department rule FR 212. He further found that Chief Sheldon's directive that Holliday submit to drug testing was reasonable and within Sheldon's authority, and that Holliday's unreasonable delay in complying with this directive was a violation of department rule FR 258. He found that Sheldon was acting within his authority when he convened an investigative board and directed Holliday's appearance, and that Holliday's refusal to cooperate with the board was a violation of department rules FR 258 and FR 106.

The hearing officer further found that the MMBA did not prevent Chief Sheldon from ordering Holliday to submit to drug testing without meeting and conferring with union representatives.

Although finding that most of the charged rule violations were supported by the evidence, the hearing officer found the discipline imposed excessive. He instead recommended that Holliday receive a 60-day suspension (reduced to 39 days due to the 21 days of suspension already imposed), with no reduction in rank. He stated that a two-rank reduction would cause Holliday to lose an estimated $170,000 in salary and retirement benefits.

On January 21, 1988, City Manager Lipsky wrote to Holliday to inform him that he had adopted the findings and conclusions of the hearing officer, but rejected the officer's recommended discipline. "On balance, I find that the Fire Chief's original action in demoting you to the rank of Fire Fighter is justified." Lipsky also reimposed the biannual drug tests which Chief Sheldon had previously ordered.

On April 7, 1988, Holliday filed a verified petition for writ of mandate in the Stanislaus County Superior Court seeking relief from the ordered discipline (Code Civ. Proc., § 1094.5). Respondents City of Modesto, City Manager Lipsky, and Chief Sheldon answered on May 4.

Holliday subsequently moved for issuance of a peremptory writ of mandate. After hearing, the court issued a partial ruling on January 23, 1989. The court found that Holliday had violated rule FR 212 in that Holliday's conduct was such as could bring reproach to the fire department. The court disagreed with the hearing officer's conclusion that Holliday's conduct before the investigative board violated department rules. The court further found that Chief Sheldon had ordered Holliday to submit to drug testing, that this order was lawful and not in violation of the MMBA, and that the written statement by Dr. Broderick "was not what the Chief directed as [Holliday], using common sense, had to know that a 'drug test' meant a physical test."

The court found, as had the hearing officer, that the discipline imposed was "excessive." However, the court did not go so far as to hold that the discipline was an abuse of discretion. Instead, it requested additional briefing on this question.

Each side submitted additional points and authorities. On March 30, 1989, the court issued a minute order denying the petition for writ of mandate, finding no abuse of discretion in the discipline imposed. A formal statement of decision dated July 6, 1989, repeated the same theme: "From the cases cited, it appears that Respondents could even have terminated Petitioners with the same result, supporting the position that the punishment imposed was of the nature where reasonable minds could differ." The statement of decision and judgment were filed on July 10. This appeal followed.

## DISCUSSION

### I. *What Is The Appropriate Standard Of Review?**

. . . . . . . . . . . . . . . . . . . .

### II. *Did Respondents' Actions in Requiring Drug Testing Without Union Involvement Violate the MMBA?*

The MMBA (§ 3500 et seq.) governs the rights of employees of public agencies to organize and negotiate with their employers.

"Recognized employee organizations shall have the right to represent their members in their employment relations with public agencies." (§ 3503.) "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, . . ." (§ 3504.) The public agency employer "shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations . . . and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action." (§ 3505.) Modesto's firefighters are represented by Modesto Fire Fighters Local 1289.

Holliday was ordered on February 27 and March 3, 1987, to submit to drug tests. The February 27 order directed him to do so "prior to returning

---

*See footnote, *ante,* page 528.

to [his] normal duty assignment." The March 3 order was a suspension without pay pending compliance with the previous order, to begin on March 11. Apparently the ordering of drug tests was a brand new procedure unilaterally adopted by respondents without notice. To the best of Chief Sheldon's knowledge, no firefighter had ever previously been ordered to take a drug test.

On March 8, 1987, Local 1289's counsel wrote to Chief Sheldon, advising him that the ordered drug testing was a "new condition of continued employment" requiring prior negotiation with the union under the MMBA. "The City may not unilaterally impose a mandatory drug program prior to an impasse in negotiation." The respondents did not reply to the union's letter. In the proceedings below and on appeal the respondents contend that the drug testing ordered in this case was not subject to the MMBA.

"Although the Meyer-Milias-Brown Act [*sic*] requires that a government employer 'meet and confer' regarding 'wages, hours and other terms and conditions of employment' . . . a public entity does not need to meet and confer over 'considerations of the merits, necessity, or organization of any service activity provided by law or executive order' (*Government Code*, Section 3504)."

■ In *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971], the Supreme Court attempted to "reconcil[e] the two vague, seemingly overlapping phrases of the statute: 'wages, hours and working conditions,' which, broadly read could encompass practically any conceivable bargaining proposal; and 'merits, necessity or organization of any service' which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion." (*Id.* at p. 615.) The Supreme Court observed that "the Legislature included the limiting language not to restrict bargaining on matters directly affecting employees' legitimate interests in wages, hours and working conditions but rather to forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions." (*Id.* at p. 616.)

Thus, the question here is whether respondents' orders that Holliday submit to drug testing constitute a condition of employment, and thus a subject of negotiation with the union, as opposed to a "more general managerial policy decision[]" beyond the scope of union representation and the MMBA's meet and confer requirement.

Apparently no reported California case deals with this issue. ■ However, any federal cases interpreting the National Labor Relations Act (NLRA) are viewed as authority in analyzing the MMBA.

"The Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) parallels the National Labor Relations Act (29 U.S.C. § 151 et seq. (NLRA)) and California courts should look to federal case law in interpreting the act." (*Public Employees Assn.* v. *Board of Supervisors* (1985) 167 Cal.App.3d 797, 806-807 [213 Cal.Rptr. 491].)

Holliday points out that the National Labor Relations Board (NLRB) has concluded that drug testing of current employees is a mandatory subject of bargaining under the NLRA.

"We find that the Respondent's newly imposed requirement of drug/alcohol testing for employees who require medical treatment for work injuries is a mandatory subject of bargaining. In *Ford Motor Co.* v. *NLRB*, the Supreme Court described mandatory subjects of bargaining as such matters that are 'plainly germane to the "working environment"' and 'not among those "managerial decisions, which lie at the core of entrepreneurial control."' Applying these standards to the issue before us, we find the drug/alcohol testing requirement to be both germane to the working environment, and outside the scope of managerial decisions lying at the core of entrepreneurial control." (*Johnson-Bateman Co.* (1989) 131 Lab.Rel.Ref. Manual (Bur.Nat.Affairs) pp. 1393, 1396, fns. omitted.)

Although the testing in *Johnson-Bateman* was of workers "who require medical treatment for work injuries," the rationale for the NLRB's conclusion appears to apply here. As in *Johnson-Bateman*, the instituted testing constitutes "a condition of employment because it has the potential to affect the continued employment of employees who become subject to it." (*Johnson-Bateman Co., supra*, 131 Lab.Rel.Ref. Manual at p. 1397.) The NLRB likened drug/alcohol testing to physical examinations and polygraph testing, both of which had previously been found to be mandatory subjects of bargaining. (*Id.* at p. 1396; see *Lockheed Shipbuilding Co.* (1984) 273 NLRB 171, 177 [physical examinations]; *LeRoy Machine Co.* (1964) 147 NLRB 1431, 1432, 1438-1439 [physical examinations]; *Austin-Berryhill, Inc.* (1979) 246 NLRB 1139 [polygraph testing]; *Medicenter, Mid-South Hospital* (1975) 221 NLRB 670 [polygraph testing].) "[T]he Respondent has introduced relatively sophisticated technology, substantially varying both the mode of the investigation and the character of proof on which an employee's job security might depend. [¶] In light of the above considerations, therefore, we conclude that the drug/alcohol testing requirement is entirely 'germane to the working environment,' . . . and thus, to that extent, it is a mandatory subject of bargaining." (*Johnson-Bateman Co., supra*, 131 Lab.Rel.Ref. Manual at p. 1397, fn. omitted.)

Similarly, the NLRB found that the drug-testing program was "outside the scope of managerial decisions lying at the core of entrepreneurial

control." "It does not involve the commitment of investment capital and cannot otherwise be characterized as a decision taken with a view toward changing the scope or nature of the Respondent's enterprise. It is rather a more limited decision directed toward reducing workplace accidents and attendant insurance rates. Accordingly, we conclude that the instant drug/alcohol testing requirement is a mandatory subject of bargaining." (*Johnson-Bateman Co., supra,* 131 Lab.Rel.Ref. Manual at pp. 1397-1398, fn. omitted.)

Respondents seek to distinguish *Johnson-Bateman,* pointing out that it and other similar NLRB decisions did not involve testing based on individualized suspicion. They cite no authority for drawing the distinction, however, and we see no basis for it in the provisions of the MMBA or its NLRA counterpart. If a matter relates to the employment conditions of a single employee, even one who is reasonably suspected of drug use, it appears to fall within the scope of representation.

The court below apparently accepted respondents' argument that reasonable suspicion is a sufficient basis for ordering drug tests without prior negotiation. In its ruling and statement of decision the court, dismissing Holliday's MMBA-grounded contention, said:

". . . While [Holliday] may be correct that submission of drug tests in general by employees is subject to collective bargaining and cannot unilaterally be imposed by the employer, the Court concludes that the reasoning of the out of state cases cited by respondent[s] on this issue is compelling and that an employee reasonably believed to have been using drugs may be compelled to submit to a drug test at the direction of his employer. *Turner* v. *Fraternal Order of Police* (1980) 500 A.2d 1005; *O'Connor* v. *Ortega* (1987) 107 S.Ct. 1492; *Everett* v. *Napper* (1987) 833 F.2d 1507; *Lovvern* [*sic*] v. *City of Chattanooga, Tenn.* (1988) 846 F.2d 1539. See also *White* v. *Davis* (1975) 13 C.3d 757, where compelling State interest overrides one's right to privacy."

None of the cases cited by the lower court, however, have anything to do with the bargaining requirements of the MMBA, or of the NLRA. Although the plaintiff in *O'Connor* v. *Ortega* (1987) 480 U.S. 709 [94 L.Ed.2d 714, 107 S.Ct. 1492] was apparently a California public employee covered by the MMBA, that case was framed purely on Fourth Amendment grounds. *Turner* v. *Fraternal Order of Police* (D.C. 1985) 500 A.2d 1005, *Everett* v. *Napper* (11th Cir. 1987) 833 F.2d 1507, and *Lovvorn* v. *City of Chattanooga, Tenn.* (6th Cir. 1988) 846 F.2d 1539, vacated and rehearing granted 861 F.2d 1388, substitute opinion *Penny* v. *Kennedy* (6th Cir. 1990) 915 F.2d 1065, all involved public employees outside California, thus be-

yond the reach of both the MMBA and the NLRA (which excludes from its purview "any State or political subdivision thereof"; see 29 U.S.C. § 152). Finally, *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222] was a police search, not an employment-related matter at all.

As another justification for ordering drug tests without prior negotiation respondents cite *San Jose Peace Officer's Assn.* v. *City of San Jose* (1978) 78 Cal.App.3d 935 [144 Cal.Rptr. 638]. In that case San Jose's police department, without meeting and conferring with its employees' organization, adopted a regulation governing the circumstances under which a police officer would be permitted to discharge a firearm. The appellate court upheld the city's action because the "use of force policy is as closely akin to a managerial decision as any decision can be in running a police department, surpassed only by the decision as to whether force will be used at all. While private managerial concepts do not translate easily to the public sector, we can imagine few decisions more 'managerial' in nature than the one which involves the conditions under which an entity of the state will permit a human life to be taken." (*Id.* at p. 946.) The central theme of the court's reasoning seems to be that "the use of force policy is primarily a matter of public safety" which impinges only indirectly on a condition of employment. (*Id.* at p. 947.)

In reaching its decision, the *San Jose Peace Officer's Assn.* court distinguished *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608 in which the California Supreme Court indicated that if a constant manning procedure there under review "primarily" involved employee workload and safety it would relate to a condition of employment, but not if it "primarily" involved the city's fire protection policy. As noted, the *San Jose* court concluded that employee safety was not the city's primary motivation in adopting the use of force regulation.

Significantly, the *San Jose* court, while discussing the employee safety aspect of the city's use of force policy, noted a difference between the dangers facing policemen and those facing firemen. "[P]olice work presents danger from third parties, rather than from dangerous working conditions. Thus the employer cannot eliminate safety problems merely by purchasing better equipment or by increasing the work force, as in *Fire Fighters [Union* v. *City of Vallejo, supra,* 12 Cal.3d 608]." (78 Cal.App.3d at p. 946.)

Respondents urge us to apply the *San Jose* decision here. On this record, however, we are unable to do so.

Initially, we note that the trial court made no findings regarding the purposes respondents sought to accomplish by ordering drug testing. Had

the court found that the order was designed *primarily* to protect public safety, the finding would not be supported by substantial evidence. Respondents offered no evidence that public safety was their primary consideration. Chief Sheldon testified Holliday's duties as a fire lieutenant were "to give orders and to direct men in fire suppression, EMS [emergency medical service] duties, routine duties, and the station's inspections, and a lot of other associated work in that regard." A lieutenant does not normally operate equipment. When asked to explain his reasons for requiring a drug test, Chief Sheldon responded:

"Any impaired judgment on [Holliday's] part or wrong action could impair the safety and the welfare of those men that work under [him], and, also, those men that worked with [him]. In a specific emergency circumstance which may or may not come up, but could come up in a moment's notice, any impairment could jeopardize [him] and other men as well as the public."

Although Chief Sheldon's testimony would support a finding that public safety was one of his concerns in ordering a drug test, it does not show that public safety was his primary concern. In addition, other evidence throws doubt on respondents' contention. The first drug-test order was given on February 27, 1987, although Chief Sheldon learned of the marijuana smoking incident on February 26. When he first learned of the incident on the 26th, Chief Sheldon made no effort to ascertain whether Holliday was then on duty (he was). If public safety was Chief Sheldon's primary concern, one would expect him to take immediate steps to prevent Holliday from working. In neither of his written directives to Holliday, dated February 27 and March 3, did Chief Sheldon refer to public safety as a reason for ordering drug tests. Indeed, in the February 27 memorandum Chief Sheldon ordered that as an alternative to submitting to a drug test Holliday could present a statement by a licensed physician that "marijuana was prescribed for your use." Again, if Chief Sheldon's primary concern was that Holliday's marijuana use threatened public safety, it would not matter whether the use was legal or illegal.

While the trier of fact may not be required to draw the inferences we suggest (that is, that Chief Sheldon's primary reason for ordering a drug test was not the protection of public safety) the evidence clearly does not support the opposite inference.

Because of the fundamental differences between the use of force policy reviewed in the *San Jose* case and the drug-test order involved here, and because of the absence of evidence showing that respondents' primary purpose was protection of public safety, we cannot apply *San Jose* in this case.

■ It is worth emphasizing here that the MMBA does not prohibit a public employer from adopting a mandatory drug testing program or adopting any other policy or course of action. The statute simply requires that the employer first meet and confer in good faith with the employee bargaining organization and fully consider that organization's presentations. (§ 3505.) The interests and concerns of any employee subjected to a mandatory drug-testing policy are obvious. Many serious and legitimate questions arise whenever a drug-testing program is considered, including: under what conditions is testing appropriate; what type of testing is appropriate; who conducts the tests; what safeguards are utilized for laboratory integrity and chain of custody of test samples; what retesting procedures are available? Good faith pursuit of the bargaining process will require attention to these and other pertinent issues and may result in a policy serving the interests of both employer and employees. Even if agreement is not reached, the employer, having satisfied its MMBA obligations, may implement a policy without submitting to mediation. (*Alameda County Employees' Assn.* v. *County of Alameda* (1973) 30 Cal.App.3d 518, 533-534 [106 Cal.Rptr. 441].) The MMBA also permits action by the public agency in cases of emergency. (§ 3504.5.)

We conclude that the order for Holliday to submit to drug testing was a matter "relating to employment conditions" not requiring "consideration of the merits, necessity, or organization of any service or activity provided by law . . . ." (§ 3504.) Before issuing the orders respondents were required to meet and confer in good faith with the employees' bargaining organization and fully consider the presentations of the organization. (§ 3505.) Respondents failed to comply with their MMBA obligations.

III., IV.*

. . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed with directions to enter a new judgment granting Holliday's petition for writ of mandate ordering respondent Garth Lipsky, as Modesto City Manager, to set aside those portions of his determination of January 21, 1988, finding that appellant disobeyed direct orders of his superior and imposing discipline on appellant; the order shall further direct respondent Lipsky to make a new determination imposing discipline for appellant's violation of Modesto Fire Department rule FR 213(f) which

* See footnote, *ante*, page 528

is fair, just, and reasonable but is at a level less than a two-rank demotion and does not include drug-testing orders. Costs to appellant.

Stone (W. A.), Acting P. J., and Harris, J., concurred.