[No. S120546. Aug. 14, 2006.]

CLAREMONT POLICE OFFICERS ASSOCIATION, Plaintiff and Appellant, v.
CITY OF CLAREMONT et al., Defendants and Respondents.

**COUNSEL**

Lackie & Dammeier, Dieter C. Dammeier and Michael A. Morguess for Plaintiff and Appellant.

Rains, Lucia & Wilkinson and Alison Berry Wilkinson for Peace Officers Research Association of California's Legal Defense Fund as Amicus Curiae on behalf of Plaintiff and Appellant.

Liebert Cassidy Whitmore, Richard M. Kreisler, Mark H. Meyerhoff; Best Best & Krieger, Jeffrey V. Dunn, Sonia R. Carvalho and Sandra M. Schwarzmann for Defendants and Respondents.

Alan L. Schlosser, Mark Schlosberg; and Peter Eliasberg for American Civil Liberties Union Foundation of Northern California and American Civil Liberties Union Foundation of Southern California as Amici Curiae on behalf of Defendants and Respondents.

Jeffrey Kightlinger, Henry Barbosa, Henry Torres, Jr.; Atkinson, Andelson, Loya, Ruud & Romo, James F. Baca, Warren S. Kinsler, Nate Kowalski and Joshua E. Morrison for Metropolitan Water District of Southern California as Amicus Curiae on behalf of Defendants and Respondents.

Meyers, Nave, Riback, Silver & Wilson, Andrea J. Saltzman and Arthur A. Hartinger for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

CHIN, J.—In this case, we consider a provision of the Meyers-Milias-Brown Act (MMBA) (Gov. Code,[1] § 3500 et seq.), which governs labor-management relations at the local government level. Section 3505 mutually obligates a public employer and an employee organization to meet and confer in good faith about a matter within the "scope of representation" concerning, among other things, "wages, hours, and other terms and conditions of employment" (§ 3504). A fundamental managerial or policy decision, however, is outside the scope of representation (§ 3504), and is excepted from section 3505's meet-and-confer requirement.

For reasons that follow, we conclude that there is a distinction between an employer's fundamental managerial or policy decision and the implementation of that decision. To determine whether an employer's action implementing a fundamental decision is subject to the meet-and-confer requirement (§ 3505), we employ the test found in our decision in *Building Material & Construction Teamsters' Union  v. Farrell* (1986) 41 Cal.3d 651, 660 [224 Cal.Rptr. 688, 715 P.2d 648] (*Building Material*).

Applying that test to the case at hand, we reverse the judgment of the Court of Appeal.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Claremont Police Officers Association (Association) is an employee organization representing public employees of defendant City of Claremont (City), including police officers and recruits, police agents, communication officers, record clerks, jailors and parking enforcement officers. In May 2000, the City's police department (Department) implemented a tracking program to determine if police officers were engaging in racial profiling. The Association, as the "[r]ecognized employee organization,"[2] did not request to meet and confer with the City beforehand. Under the program, if an officer stopped a vehicle or person without issuing a citation or making an arrest, the officer was required to radio the Department with information about the stop, including the person's race. The program lasted one year.

After the City's police commission concluded that the data collected in the pilot tracking program was insufficient to determine whether officers engaged in racial profiling, the commission appointed a subcommittee and advisory

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] A "[r]ecognized employee organization" is "an employee organization which has been formally acknowledged by the public agency as an employee organization that represents employees of the public agency." (§ 3501, subd. (b).)

panel to prepare a further study. In February 2002, the police commission adopted the subcommittee's recommendation that the Department implement a "Vehicle Stop Data Collection Study" (Study), which is at issue in this case. This Study required officers on all vehicle stops to complete a preprinted Scantron form called a "Vehicle Stop Data Form" (Form). The Form included questions regarding the "driver's perceived race/ethnicity," and the "officers' prior knowledge of driver's race/ethnicity." On average, the Form takes two minutes to complete, and an officer may complete between four and six Forms for each 12-hour shift. Each Form is traceable to the individual officer making the stop. The Study was to last 15 months, commencing July 1, 2002.

In April 2002, the Association requested that the City meet and confer regarding the Study because it asserted "the implementation of policy and procedures in regards to this area falls under California Government Code section 3504." On April 11, 2002, the City gave written notice disagreeing that the Study fell within the scope of representation under section 3504. On June 27, 2002, the Department informed officers it would implement the Study effective July 1, 2002. On July 11, 2002, the Association filed a petition for writ of mandate to compel the City and the Department not to implement the Study until they meet and confer in good faith under the MMBA.

On August 22, 2002, the superior court denied the petition. In its detailed statement of findings and conclusions, the court concluded, among other things, that the Study did not substantially affect the terms and conditions of the Association members' employment, and that "given the de minimus impact upon workload, and the predominantly policy directed objectives of the Study, . . . the Study falls primarily within management prerogatives under § 3504, and is not a matter within the scope of representation requiring compliance with the meet and confer provisions of the MMBA."

The Court of Appeal reversed. While it concluded the City's decision to take measures to combat the practice of racial profiling and the public perception that it occurs is "a fundamental policy decision that directly affects the police department's mission to protect and to serve the public," the Court of Appeal held that "the decision precisely *how to implement* that fundamental policy, however, involves several variables affecting law enforcement officers and is not itself a fundamental policy decision."[3] The Court of Appeal explained that "the vehicle stop policy significantly affects officers' working conditions, particularly their job security and freedom from disciplinary

---

[3] Although the Court of Appeal appeared at times to construe the City's fundamental decision as the decision to undertake measures against the practice of racial profiling, on the one hand, and the implementation of that decision as the adoption of the Study, on the other, neither of the parties adopts such a broad construction; nor do we. (See *post*, at pp. 632–634.)

action, their prospects for promotion, and the officers' relations with the public. Racial profiling is illegal. [Fn. omitted.] An officer could be accused of racial profiling and subjected to disciplinary action, denial of promotion, or other adverse action based in part on the information collected under the new policy. For this reason, the manner that the information is collected and the accuracy of the data and data analysis are matters of great concern to the association's members."

We granted review.

## II. DISCUSSION

### A. *Background of the MMBA*

■ The MMBA applies to local government employees in California. (*Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 614, fn. 4 [116 Cal.Rptr. 507, 526 P.2d 971] (*Fire Fighters Union*).)[4] "The MMBA has two stated purposes: (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. (§ 3500.) To effect these goals the act gives local government employees the right to organize collectively and to be represented by employee organizations (§ 3502), and obligates employers to bargain with employee representatives about matters that fall within the 'scope of representation' (§§ 3504.5, 3505)." (*Building Material, supra,* 41 Cal.3d at p. 657.) The duty to meet and confer in good faith is limited to matters within the "scope of representation": the public employer and recognized employee organization have a "mutual obligation personally to meet and confer promptly upon request by either party . . . and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year." (§ 3505.) Even if the parties meet and confer, they are not required to reach an agreement because the employer has "the ultimate power to refuse to agree on any particular issue. [Citation.]" (*Building Material, supra,* 41 Cal.3d at p. 665.) However, good faith under section 3505 "requires a genuine desire to reach agreement." (*Placentia Fire Fighters v. City of Placentia* (1976) 57 Cal.App.3d 9, 25 [129 Cal.Rptr. 126].)

---

[4] The MMBA has its roots in the 1961 enactment of the George Brown Act, which originally appeared as sections 3500 through 3509. (See Stats. 1961, ch. 1964, pp. 4141–4143.) "The legislative revisions of 1968 and 1971 reserved those sections for the Meyers-Milias-Brown Act, and reenacted the George Brown Act, now limited to the relationship between the state government and state employees, as Government Code sections 3525–3536." (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 335, fn. 5 [124 Cal.Rptr. 513, 540 P.2d 609].)

## 1. *"Scope of representation"*

■ Section 3504 defines "scope of representation" to include "all matters relating to employment conditions and employer-employee relations, including, but not limited to, *wages, hours, and other terms and conditions of employment*, except, however, that the scope of representation shall not include consideration of the *merits, necessity, or organization* of any service or activity provided by law or executive order." (Italics added.) The definition of "scope of representation" and its exceptions are "arguably vague" and "overlapping." (*Building Material, supra,* 41 Cal.3d at p. 658; *Fire Fighters Union, supra,* 12 Cal.3d at p. 615.) " '[W]ages, hours and working conditions,' which, broadly read could encompass practically any conceivable bargaining proposal; and 'merits, necessity or organization of any service' which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion." (*Fire Fighters Union, supra,* 12 Cal.3d at p. 615.)

■ Courts have interpreted "wages, hours, and other terms and conditions of employment," which phrase is not statutorily defined, to include the transfer of bargaining unit work to nonunit employees (*Building Material, supra,* 41 Cal.3d at p. 659; *Dublin Professional Fire Fighters, Local 1885 v. Valley Community Services Dist.* (1975) 45 Cal.App.3d 116, 119 [119 Cal.Rptr. 182]); mandatory drug testing of employees (*Holliday v. City of Modesto* (1991) 229 Cal.App.3d 528, 530 [280 Cal.Rptr. 206] (*Holliday*)); work shift changes (*Independent Union of Pub. Service Employees v. County of Sacramento* (1983) 147 Cal.App.3d 482, 487 [195 Cal.Rptr. 206]); and the adoption of a disciplinary rule prohibiting use of city facilities for personal use (*Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802 [165 Cal.Rptr. 908]). Notwithstanding section 3504's broad language, to require an employer to bargain, its action or policy must have "a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees." (*Building Material, supra,* 41 Cal.3d at p. 660.)

## 2. *"Merits, necessity or organization"*

■ Even if an employer's action or policy has a significant and adverse effect on the bargaining unit's wages, hours, and working conditions, the employer may be excepted from bargaining requirements under the "merits, necessity, or organization" language of section 3504. (*Building Material, supra,* 41 Cal.3d at p. 660.) This exclusionary language, which was added in 1968, was intended to "forestall any expansion of the language of 'wages, hours and working conditions' to include more general managerial policy decisions." (*Fire Fighters Union, supra,* 12 Cal.3d at p. 616; Stats. 1968, ch. 1390, § 4, p. 2727.) "Federal and California decisions both recognize the

right of employers to make unconstrained decisions when fundamental management or policy choices are involved." (*Building Material, supra,* 41 Cal.3d at p. 663; see *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 937 [143 Cal.Rptr. 255] (*Berkeley Police Assn.*) ["To require public officials to meet and confer with their employees regarding fundamental policy decisions such as those here presented, would place an intolerable burden upon fair and efficient administration of state and local government"]; see also *First National Maintenance Corp. v. NLRB* (1981) 452 U.S. 666, 678–679 [69 L.Ed.2d 318, 101 S.Ct. 2573] (*First National Maintenance*).)

Such fundamental managerial or policy decisions include changing the policy regarding a police officer's use of deadly force (*San Jose Peace Officer's Assn. v. City of San Jose* (1978) 78 Cal.App.3d 935, 947 [144 Cal.Rptr. 638] (*San Jose Peace Officer's Assn.*)), permitting a member of the citizen's police review commission to attend police department hearings regarding citizen complaints and sending a department member to review commission meetings (*Berkeley Police Assn., supra,* 76 Cal.App.3d 931), and, in the context of private labor relations, closing a plant for economic reasons (*N. L. R. B. v. Royal Plating & Polishing Co.* (3d Cir. 1965) 350 F.2d 191, 196 (*Royal Plating*)).

### B. *Distinction Between an Employer's Fundamental Decision and the Implementation and Effects of That Decision*

■ Both parties agree that the City's decision to take measures against racial profiling, specifically its decision to implement the Study as a necessary first step, is a fundamental managerial or policy decision. Racial profiling, which has been defined as "the practice of detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped" (Pen. Code, § 13519.4, subd. (e)), is expressly prohibited by statute (*id.,* subd. (f)), and by the Department's policy.[5] The Legislature has made clear that the practice of racial profiling "presents a great danger to the fundamental principles of a democratic society. It is abhorrent and cannot be tolerated." (Pen. Code, § 13519.4, subd. (d)(1).) The City's decision to implement the Study was made in hopes to "improve relations between the police and the community and establish the Claremont Police Department as an open and progressive agency committed to being at the forefront of the best professional practices in law enforcement." (See *Building Material, supra,* 41 Cal.3d at p. 664 [matters relating to "the betterment of police-community relations . . . are of obvious importance, and directly affect the quality and nature of public services"]; *Berkeley Police Assn., supra,* 76 Cal.App.3d at p. 937

---

[5] The Department's policy provides: "Officers shall stop persons on the basis of all available information, not solely on the basis of race or ethnicity." (Dept. Rules & Regs., § 1.030.3.05.)

[same]; see also *San Jose Peace Officer's Assn., supra,* 78 Cal.App.3d at p. 946 ["the use of force policy is as closely akin to a managerial decision as any decision can be in running a police department"].) Thus, the Association concedes that the City "may have the right to unilaterally decide to implement a racial profiling study."

However, the Association maintains that the Study's implementation and effects involve many factors that are distinct from the City's fundamental decision to adopt the Study. These factors include, on the one hand, determining the methodology used in collecting the data, and on the other, determining the effects or use of the Study's data, i.e., whether the data would be used only for study purposes, whether results based on the analyzed data or results regarding individual officers would be made public, whether and under what circumstances the results could be used against officers (including imposing discipline or denying promotions), and what the implications are for officers' privacy and the potential for self-incrimination. The Association concludes that meeting and conferring on the Study's implementation and effects will not directly interfere with the City's right to exercise its managerial prerogative. The Association contends that although *Building Material* is distinguishable, it "completely recognizes this 'dichotomy.' "

The City, however, counters that the Court of Appeal misinterpreted section 3504 and calls this dichotomy "unprecedented." It maintains that a public employer's fundamental decision and the implementation of that decision "are integral to the nature of the public agency and are thus, *equally excluded* from the bargaining process under Section 3504." The City's amicus curiae, League of California Cities (League), argues that drawing an implementation distinction is both "artificial and unworkable" because "[i]t is pointless to adopt a policy if it cannot be implemented." According to the League, the Association's contention begs the question "how the City could implement the Study and collect the data if it were not known *how* the data would be collected and *how* it would be used." Another amicus curiae, Metropolitan Water District of Southern California, adds that "the policy and its implementation cannot be severed and analyzed separately. Rather, the former is interwoven with the latter, such that a decision to compel negotiation of the implementation would inevitably compel negotiation of the policy decision itself."

At the outset, we agree with the Association that there is a long-standing distinction under the National Labor Relations Act (NLRA) between an employer's unilateral management decision and the *effects* of that decision (29 U.S.C. § 158(d)), the latter of which are subject to mandatory bargaining. (*First National Maintenance, supra,* 452 U.S. at pp. 681–682; *id.* at p. 677, fn. 15; *Kirkwood Fabricators, Inc. v. N.L.R.B.* (8th Cir. 1988) 862 F.2d 1303,

1306 ["Requiring effects bargaining maintains an appropriate balance between an employer's right to close its business and an employee's need for some protection from arbitrary action"].) In other words, although "an employer has the right unilaterally to decide that a layoff is necessary, he must bargain about such matters as the timing of the layoffs and the number and identity of employees affected. [Citation.]" (*Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 64 [151 Cal.Rptr. 547, 588 P.2d 249] [discussing cases under the NLRA]); see also 1 Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2005) ¶¶ 6:80 to 6:84, p. 6-11 [discussing effects bargaining under NLRA].) For example, matters deemed subject to effects bargaining include severance pay, vacation pay, seniority, and pensions. (*N. L. R. B. v. Transmarine Navigation Corporation* (9th Cir. 1967) 380 F.2d 933, 939; *Royal Plating, supra*, 350 F.2d at p. 196 [union must have "opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision"].)

We agree with the City, however, that the issue before us is whether it was compelled to meet and confer with the Association before it required officers on their vehicle stops to fill out the Forms as part of the Study. Based on the limited record before us, there is no evidence regarding what effects would result from implementing the Study; for instance, whether the data collected and later analyzed will result in discipline if an officer is found to have engaged in racial profiling,[6] or whether the City will publicize the Study's raw data. It is also not clear from the record what exact methodology the City has adopted to analyze the collected data to determine any racial profiling. Nor can we say that racial profiling studies have been so historically associated with employee discipline that their implementation invariably raises disciplinary issues. (Cf. *Holliday, supra*, 229 Cal.App.3d at p. 540 [various details of implementing mandatory drug testing policy subject to meet-and-confer requirement].) Thus, we do not decide the issue whether the City was required to meet and confer with the Association over any effects resulting from the City's decision to implement the Study. (See *Fibreboard Corp. v. Labor Board* (1964) 379 U.S. 203, 223 [13 L.Ed.2d 233, 85 S.Ct. 398] (*Fibreboard*) (conc. opn. of Stewart, J.) [an "extremely indirect and uncertain" impact on job security may alone suffice to conclude such decisions do not concern conditions of employment].)

---

[6] Regarding any discipline that may result from an officer's failure to properly fill out the Form, the superior court found that "officers are already subject to discipline for not completing required reports." For purposes of the issue here, we conclude this type of discipline is distinguishable from any possible discipline which may be imposed if an officer is found to have engaged in racial profiling. (See *Berkeley Police Assn., supra*, 76 Cal.App.3d at p. 938 [no change in working conditions where officers "were working under these rules and conditions even prior to the challenged practices"].)

█ We disagree with the City's amici curiae that drawing a distinction between an employer's fundamental managerial or policy decision and the implementation of that decision, as a general matter, would be impossible or impractical. The reality is that "practically every managerial decision has some impact on wages, hours, or other conditions of employment." (*Westinghouse Electric Corporation v. N. L. R. B.* (4th Cir. 1967) 387 F.2d 542, 548.) Indeed, section 3504 of the MMBA codifies the unavoidable overlap between an employer's policymaking discretion and an employer's action impacting employees' wages, hours, and working conditions. (See *ante*, at p. 631; *Building Material, supra*, 41 Cal.3d at p. 657; *Fire Fighters Union, supra*, 12 Cal.3d at p. 615.) As we shall explain in greater detail below, while drawing a distinction may sometimes be difficult, the alternative—which would risk sheltering any and all actions that flow from an employer's fundamental decision from the duty to meet and confer—is contrary to established case law. (*Building Material, supra*, 41 Cal.3d at p. 660; see also *First National Maintenance, supra*, 452 U.S. at p. 686.) Although *Building Material* did not specifically decide the issue, our decision, as the City acknowledges, expressly contemplates that the implementation of an employer's fundamental decision ("action . . . taken pursuant to a fundamental managerial or policy decision"), is a separate consideration for purposes of section 3505's meet-and-confer requirement. (*Building Material, supra*, 41 Cal.3d at p. 660.)

Instead, we turn our focus to the City's implementation of the Study, requiring officers to fill out the Forms in order to collect data on possible racial profiling.

### C. *The Applicable Test*

Emphasizing that the Court of Appeal erroneously created an "automatic presumption that a meet and confer is required if implementation of a fundamental decision significantly affects the terms and conditions of employment," the City urges that our decision in *Building Material, supra*, 41 Cal.3d 651, requires us to perform a balancing test that also considers the employer's need for unencumbered decisionmaking. If the balance weighs in favor of the employer, there is no need to bargain even if the employer's action has a significant and adverse impact on the employees' working conditions. The Association counters that *Building Material*'s balancing test would apply only to the fundamental decision itself and not to its implementation or its effects.

In *Building Material, supra*, 41 Cal.3d 651, the City and County of San Francisco unilaterally eliminated two bargaining unit positions and reorganized and reclassified duties of hospital truck drivers who were members of

the Building Material and Construction Teamsters' Union, Local 216 (Union). The city transferred certain work duties to new positions that were not in the Union's bargaining unit. (*Building Material, supra,* 41 Cal.3d at p. 655.) The Union requested to meet and confer with city agencies regarding the city's action; however, the request was denied on grounds that this matter was not within the meet-and-confer obligations under the MMBA. (*Building Material, supra,* 41 Cal.3d at p. 656.)

After reviewing the background and purposes of the MMBA (*Building Material, supra,* 41 Cal.3d at pp. 657–660), we concluded that the city was required to meet and confer (§ 3505) with the Union because the city's transfer of duties to a nonbargaining unit had a significant and adverse effect on the bargaining unit's wages, hours, and working conditions. (*Building Material, supra,* 41 Cal.3d at pp. 663–664.) We rejected the city's assertion that its action was exempted as a fundamental policy decision because it concerned the effective operation of local government. (*Id.* at p. 664.) The "decision to reorganize certain work duties was hardly 'fundamental.' It had little, if any, effect on public services. Rather, it primarily impacted the wages, hours, and working conditions of the employees in question and thus was a proper subject for mandatory collective bargaining. Indeed, defendants' claim to the contrary is in conflict with the statutory framework of the MMBA: any issue involving wages, for example, would affect the cost of government services, but such matters are specifically included in the scope of representation as defined in section 3504." (*Ibid.*)

■ Going on to explain that an employer's fundamental decision may have a significant and adverse effect on the bargaining unit's wages, hours, or working conditions (*Building Material, supra,* 41 Cal.3d at p. 660), we considered whether "an action . . . taken pursuant to a fundamental managerial or policy decision" may be within the scope of representation (§ 3504), and thus subject to a duty to meet and confer. (*Building Material, supra,* 41 Cal.3d at p. 660.) As relevant here, such an action would encompass an employer's steps to implement the details of the fundamental decision. Under that circumstance, a balancing test would apply: "If an action is taken pursuant to a fundamental managerial or policy decision, it is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question." (*Building Material, supra,* 41 Cal.3d at p. 660, citing *First National Maintenance, supra,* 452 U.S. at p. 686; see *Berkeley Police Assn., supra,* 76 Cal.App.3d at p. 937; see also *San Francisco Fire Fighters Local 798 v. Board of Supervisors* (1992) 3 Cal.App.4th 1482, 1494 [5 Cal.Rptr.2d 176] (*San Francisco Fire Fighters*).)

■ The high court applied a similar balancing test in *First National Maintenance, supra,* 452 U.S. 666. While recognizing an employer's "freedom to manage its affairs unrelated to employment," the high court balanced the competing interests to determine whether mandatory bargaining was required when a fundamental management decision directly impacted employment. (*First National Maintenance, supra,* 452 U.S. at p. 677.) The high court concluded: "[I]n view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." (*Id.* at p. 679; see also *id.* at p. 686.) In discussing the issues subject to collective bargaining (*id.* at p. 676), the high court explained that employers' management decisions may range from having "only an indirect and attenuated impact on the employment relationship," to being "almost exclusively 'an aspect of the relationship' between employer and employee," to having "a direct impact on employment" though the decision is " 'not in [itself] primarily about conditions of employment . . . .' " (*Id.* at pp. 676–677, brackets in *First National Maintenance*; see also *Fibreboard, supra,* 379 U.S. at p. 223 (conc. opn. of Stewart, J.).)

■ The balancing test under *Building Material,* which has been described as a "fluid standard" (*San Francisco Fire Fighters, supra,* 3 Cal.App.4th at p. 1494), properly considers the competing interests while furthering the MMBA's neutral purpose to "promote communication between public employers and employees and to improve personnel management. (§ 3500.)" (*Building Material, supra,* 41 Cal.3d at p. 660; see also *First National Maintenance, supra,* 452 U.S. at pp. 680–681 [NLRA "is not intended to serve either party's individual interest, but to foster in a neutral manner a system in which the conflict between these interests may be resolved"].) We conclude it applies to determine whether management must meet and confer with a recognized employee organization (§ 3505) when the implementation of a fundamental managerial or policy decision significantly and adversely affects a bargaining unit's wages, hours, or working conditions.

■ In view of the vast range of management decisions and to give guidance on whether a particular matter is subject to a duty to meet and confer (§ 3505) under *Building Material, supra,* 41 Cal.3d at page 660, we find instructive the high court's observation that "[t]he concept of mandatory bargaining is premised on the belief that collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole. [Citations.] This will be true, however, only if the subject proposed for discussion is amenable to resolution through the bargaining process." (*First National Maintenance, supra,* 452 U.S. at p. 678, fn. omitted.) To that end, when balancing

638

competing interests a court may also consider whether "the transactional cost of the bargaining process outweighs its value. [Citations.]" *(Social Services Union v. Board of Supervisors* (1978) 82 Cal.App.3d 498, 505 [147 Cal.Rptr. 126] *(Social Services Union)* [discussing NLRA].) We believe this "transactional cost" factor is not only consistent with the *Building Material* balancing test, but its application also helps to ensure that a duty to meet and confer is invoked only when it will serve its purpose.

█ In summary, we apply a three-part inquiry. First, we ask whether the management action has "a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees." *(Building Material, supra,* 41 Cal.3d at p. 660.) If not, there is no duty to meet and confer. (See § 3504; see also *ante,* at p. 632.) Second, we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision. If not, then, as in *Building Material,* the meet-and-confer requirement applies. *(Building Material, supra,* 41 Cal.3d at p. 664.) Third, if both factors are present—if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees—we apply a balancing test. The action "is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question." *(Building Material, supra,* 41 Cal.3d at p. 660.) In balancing the interests to determine whether parties must meet and confer over a certain matter (§ 3505), a court may also consider whether the "transactional cost of the bargaining process outweighs its value." *(Social Services Union, supra,* 82 Cal.App.3d at p. 505.)

Next, we apply the foregoing standard to the facts of this case to determine whether the City was required to meet and confer (§ 3505) with the Association before implementing the Study.

### D. *Application to the Present Case*

█ Applying the test under *Building Material,* we conclude that the implementation of the Study did not have a significant and adverse effect on the officers' working conditions. *(Building Material, supra,* 41 Cal.3d at p. 660.) The record reflects that "[i]n those cases resulting in citation or arrest, the Study requires slightly more information to be collected by the officer than required in completing the citation or arrest report." Based on "undisputed evidence," the superior court determined that officers may complete a Form in about two minutes and may complete between four and six such Forms in a 12-hour shift. The superior court concluded that the impact on the officers' working conditions was de minimis. We agree and conclude

the City was not required to meet and confer (§ 3505) with the Association before implementing the Study. Because there was no significant and adverse effect, we need not balance the City's need for unencumbered decisionmaking—in this case, its policymaking prerogative to eliminate the practice and perception of racial profiling and to determine the best means for doing so—against the benefit to employer-employee relations from bargaining about the subject. (*Building Material, supra,* 41 Cal.3d at p. 660; see also *First National Maintenance, supra,* 452 U.S. at p. 686.)

In conclusion, we emphasize the narrowness of our holding. In determining that the City was not required to meet and confer with the Association before implementing the Study, we do not decide whether such a duty would exist should issues regarding officer discipline, privacy rights, and other potential effects (see *ante,* at pp. 634–635), arise after the City implements the Study. Based on the record, that question is not before us.

### III. DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring.—I agree with the majority's narrow holding that the City of Claremont (City) need not meet and confer regarding its decision to conduct a racial profiling study and to adopt a particular data collection method in implementing the study, and that we need not consider other issues raised by the Claremont Police Officers Association (Association). As the majority states: "Based on the limited record before us, there is no evidence regarding what effects would result from implementing the Study; for instance, whether the data collected and later analyzed will result in discipline if an officer is found to have engaged in racial profiling, or whether the City will publicize the Study's raw data. It is also not clear from the record what exact methodology the City has adopted to analyze the collected data to determine any racial profiling. Nor can we say that racial profiling studies have been so historically associated with employee discipline that their implementation invariably raises disciplinary issues. (Cf. *Holliday* [*v. City of Modesto* (1991)] 229 Cal.App.3d [528,] 540 [280 Cal.Rptr. 206] [various details of implementing mandatory drug testing policy subject to meet-and-confer requirement].) Thus, we do not decide the issue whether the City was required to meet and confer with the Association over any effects resulting from the City's decision to implement the Study." (Maj. opn., *ante,* at p. 634,

fn. omitted.) Instead, the majority addresses only "the City's implementation of the Study, requiring officers to fill out the Forms in order to collect data on possible racial profiling." (*Id.* at p. 635.)

That having been said, it is no doubt true that the study results may potentially be used to discipline police officers or may have other adverse employment consequences for them, because racial profiling is a serious form of police misconduct. In my view, the use of the study as an additional basis for discipline would give rise to a duty on the City's part to meet and confer with the Association. The City's adoption of a new basis for disciplining police officers goes to the heart of officers' employment security, and is therefore one of the critical "terms and conditions of employment" at the core of Government Code section 3504 . (See *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 618 [116 Cal.Rptr. 507, 526 P.2d 971].) Although the City plainly has the authority and responsibility to discipline officers who persistently engage in racial profiling, its unfettered right to do so does not outweigh the Association's interest in ensuring, through negotiations with the City, that any such discipline follows due process and that the study results have been accurately and fairly analyzed.

Kennard, J., concurred.