Filed 5/27/26  County of Santa Clara v. PERB CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>Petitioner,<br><br>v.<br><br>PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>Respondent;<br><br>REGISTERED NURSES PROFESSIONAL ASSOCIATION et al.,<br><br>Real Parties in Interest. | H051570<br>(PERB Case No. SF-CE-1796-M) |

The Legislature has declared "all public employees" to be "disaster service workers," who "in conditions of disaster or … extreme peril to life, property, and resources" may be deployed for "such disaster service activities as may be assigned to them by their superiors or by law."  (Gov. Code, § 3100.)[1]  At the same time, the Meyers-Milias-Brown Act (MMBA; § 3500 et seq.) requires public employers to "meet and confer in good faith" with representative employee unions about "terms and conditions of employment" that are "within the scope of [union] representation."  (§ 3505.)  Exempt from this duty to bargain are "fundamental managerial or policy

_____

[1] Undesignated statutory references are to the Government Code.

decision[s]" (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 628 (*Claremont*)), or "the merits, necessity, or organization of any service or activity provided by law or executive order" (§ 3504). But when the duty to bargain applies, the public agency must "consider fully" a union's position on behalf of its members before "arriving at a determination of policy or course of action." (§ 3505.)

At issue here is the County of Santa Clara's use of its employees in disaster service work at the height of the COVID-19 pandemic. The Public Employment Relations Board (PERB) held that the county had engaged in unfair labor practices by not affording the Registered Nurses Professional Association (Registered Nurses) and Service Employees International Union, Local 521 (SEIU) "notice and an opportunity to meet and confer in good faith over: (1) assignments to [private] nursing facilities … and motels; (2) new and amended [disaster service] policies; and (3) the effects of scaling back services at certain medical clinics." PERB reasoned that the emergency circumstances presented by the pandemic were not relevant to the threshold determination whether the county's decisions were subject to mandatory bargaining, but only to the timing of mandatory bargaining. We granted the county's petition for writ of review, to clarify the scope of the county's duty to bargain with union representatives, at least as practicable (§ 3504.5), about the decision to deploy represented employees as disaster service workers (DSW's), the manner of deployment, and the effects of those deployments on conditions of employment.

We reject the county's contention that the disaster service assignments represented no change to the employees' status quo or were exempted by section 3100 from the duty to bargain. Although the county concedes its obligation to bargain as practicable over certain effects of the deployment, we also reject its challenges to PERB's determination of which effects are subject to bargaining and whether the county complied. But as to the county's threshold decision to deploy represented employees as DSW's—as distinct from the operational decisions implementing that decision—PERB erred as a matter of law in

2

refusing to consider the public health emergency in assessing whether this was a fundamental managerial or policy decision that was outside the scope of representation. And while substantial evidence supports PERB's determination that the county's revision of its DSW policy guidance for employees changed the status quo, here too PERB's erroneous refusal to consider the public health emergency is apparent in its reasoning. We will therefore annul PERB's decision and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  *The Unfair Practice Charge and PERB Complaint*

In May 2020, Registered Nurses and SEIU filed an unfair labor practice charge against the county.  As a result, PERB's Office of General Counsel filed a complaint against the county.

The General Counsel alleged that in April 2020, after temporarily closing at least one of its medical clinics, the county (1) unilaterally adopted a policy of assigning represented employees to privately owned nursing facilities, hotels, or shelters, changing the terms and conditions of the employees' work; (2) unilaterally modified its existing DSW policy applicable to covered employees; and (3) bypassed the unions by dealing directly with covered employees, while failing to provide the unions with requested information that was relevant and necessary to represent their members.

### B.  *The PERB Decision[2]*

The county provides medical services through Santa Clara Valley Medical Center (SCVMC) hospitals and clinics.  Registered Nurses represents thousands of registered nurses working for the county.  SEIU likewise represents thousands of county workers, including licensed vocational nurses and others.

---

[2] There being no dispute about the evidentiary facts summarized in PERB's decision, we draw our summary of the evidence from the decision itself.

In February 2020, the county declared an emergency due to the COVID-19 pandemic. In March,[3] the county issued a shelter-in-place order. Beginning in March and April, the county issued three documents related to DSW assignments, scaled back medical services at some county facilities, assigned its employees to work at privately owned skilled nursing facilities, and began assigning its employees to privately owned motels. The county did not bargain with the unions over these decisions. PERB ruled that much of this conduct violated the MMBA.

### 1. *County DSW Policies*

Since 2008, the county has included in its policy manual a section titled "County Employees serving as Disaster Service Workers." It included answers to " 'frequently asked questions' " (FAQ). The FAQ specified, " 'When the County Executive proclaims a countywide emergency, employees need to take care of their families first and ensure their safety; follow their department's reporting instructions; be prepared to be assigned to any type of disaster service activity. This assignment may be consistent with the employee's normal work duties and/or may require the employee to work at locations, times and conditions, other than the employee's normal assignment.' " (Italics omitted.)

In April 2020, the county issued three documents without affording the unions notice or an opportunity to bargain. One was an update to "County Employees serving as Disaster Service Workers," omitting the prior statement about employees caring for their families after an emergency declaration and adding that DSW assignments are a condition of employment, refusal of which may lead to discipline, including termination. The other documents were a new COVID-19 FAQ addressing when the county might permit employees to refuse DSW assignments and a single-page document addressing certain internal county procedures for DSW deployments.

---

[3] Undesignated dates are in 2020.

## 2. *Private Nursing Facility Assignments*

Beginning in mid-March, the county implemented changes at its clinics that reduced the need for on-site staff. The county e-mailed nurses announcing that it was scaling back services at some SCVMC clinics and stating that it planned to divert nurses to other facilities, asking nurses to rank their preferences. Around the end of the month, the county scaled back services at some SCVMC clinics. The county did not give the unions prior notice of those actions.

Without consulting the unions, the county asked nurses to volunteer for assignment to county-run skilled nursing facilities. By the end of March, the county had identified a pool of nurses who either volunteered for assignment or who worked at clinics where the county had scaled back services. In early April, the county trained several nurses for assignment to skilled nursing facilities.

Around the same time, privately owned skilled nursing and long-term care facilities were experiencing staffing shortages and a rapid increase in COVID-19 infections. Two private nursing facilities—The Ridge and Canyon Springs—had particularly acute needs and sought either staffing assistance from the county or transfer of their patients to county hospitals.

The county was concerned that if the staffing shortages at The Ridge and Canyon Springs caused these private care facilities to evacuate their patients to county hospitals, this would both spread infection in county hospitals and decrease the number of hospital beds available for patients needing acute care. So the county decided to send nurses to Canyon Springs, announcing the decision to the unions that same day in a " 'Courtesy Notice on DSW assignments.' "

Within hours, both unions asked to bargain over the county's decision. It was only in a meeting with the county the next day that Registered Nurses learned that nurses were already on their way to their first shift at Canyon Springs. The county refused Registered Nurses' request to bargain the terms and conditions of DSW employment, including

safety protocols. Over the next few weeks, the county assigned 17 nurses to Canyon Springs. While county nurses were assigned to Canyon Springs,[4] the county met almost daily with Registered Nurses about assignments to private nursing facilities, "listened to their suggestions and ideas … and answered some of their questions," but maintained that it had " 'no obligation to meet and confer on DSW assignments.' " In the same period, county representatives met with SEIU multiple times to discuss private nursing facility assignments. The county "listened to SEIU's concerns and proposals … and answered some of SEIU's questions, but denied that the meetings were bargaining sessions." After the Canyon Springs assignments were complete, the county rejected Registered Nurses' request to bargain over the selection method and deployment list for any future DSW assignments.

### 3. *Motel Assignments*

The county was concerned that people living in close physical proximity at congregate shelters were at a heightened risk of contracting COVID-19 and of worse outcomes if they contracted the virus. This ultimately led the county to contract with privately owned motels to house people experiencing homelessness and with nonprofit organizations to staff the motels. But because some of the nonprofit organizations lacked sufficient staff, the county in April 2020 assigned SEIU-represented employees to work as DSW's at the motels, without prior notice to SEIU.[5] The next month the county assigned more SEIU-represented employees to privately owned motels. As of August, at

---

[4] The assignments ended after the county helped Canyon Springs secure other staffing.

[5] As recently as March 2020, the county had assured SEIU that "the County would give notice to SEIU before further deployment" of employees reassigned to prepare a county-owned motel for occupants. The county ultimately did not use the county-owned motel to house people experiencing homelessness.

6

least two employees were in DSW motel assignments that had been extended to December 31, 2020.

Although SEIU attempted to bargain, the county again maintained that it had no obligation to do so. In April, after SEIU learned its members had been assigned to private motels, the county denied any obligation to meet and confer on DSW assignments. In late April and early May, the county met with SEIU "almost daily to discuss DSW assignments"—"the role of the assignments, [personal protective equipment (PPE)], interactions with motel residents, trash removal, laundry, food delivery, shift schedules, and other issues." Although the county listened to SEIU's concerns and answered some questions, the county maintained that it had no duty to bargain about the motel assignments.

### 4. *PERB's Conclusions and the County's Writ Petition*

PERB found that the county violated the MMBA when it failed and refused to afford the unions "notice and an opportunity to meet and confer in good faith over: (1) assignments to [private] nursing facilities … and motels; (2) new and amended [DSW] policies; and (3) the effects of scaling back services at certain medical clinics." PERB found that the county also violated the MMBA by failing to provide information the unions requested and by derivatively interfering with collective bargaining unit employees' rights to be represented and the unions' right to represent collective bargaining unit employees.

PERB reasoned that the unions established a prima facie case that the county owed, and violated, a duty to bargain over DSW-related decisions and the effects of its decision to scale back medical services at its medical clinics.[6] First, the county changed the status quo by (1) modifying its 2008 DSW policy; (2) making a new COVID-19

---

[6] PERB held that the decision to scale back services was not subject to mandatory bargaining.

7

policy;[7] and (3) reassigning employees to private nursing facilities and motels. Second, the changes were within the scope of representation because they were not mandated by external law—section 3100—and were "critical to defining the employment relationship rather than altering the overall direction of the County's enterprise." Alternatively, the new assignments were within the scope of representation because they had a significant and adverse effect on employment conditions that outweighed the county's general, nonemergency, interests. PERB considered the emergency presented by the pandemic relevant only to the county's emergency defense to the failure to bargain before acting unilaterally, not to whether the actions were subject to mandatory bargaining within the scope of representation.

PERB concluded that the county had established an emergency defense: The actions being urgently needed to save lives, the county did not need to bargain to impasse or agreement before acting. But this emergency defense did not, in PERB's reasoning, relieve the county of the duty to provide notice and an opportunity to bargain to the extent practicable. The county violated its duty to bargain in good faith by maintaining that it had no duty to bargain in good faith at all. Due to this "flat denial," PERB did not undertake a "more nuanced determination[]" of when it became practicable to give the unions notice of the emergency measures at issue.

We granted the county's timely petition for a writ of review.

## II.    DISCUSSION

The MMBA's purpose "is to promote full communication between public employers and their employees, as well as to improve personnel management and employer-employee relations in public agencies." (*County of Sonoma v. Public Employment Relations Bd.* (2022) 80 Cal.App.5th 167, 178 (*County of Sonoma*).) To that

---

[7] PERB ruled that the third policy was an internal policy beyond the scope of representation, so it did not assess whether the third policy changed the status quo.

end, "[t]he MMBA requires a public employer and employee representatives 'to meet and confer in good faith about a matter within the "scope of representation," concerning, among other things, "wages, hours, and other terms and conditions of employment." ' " (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2024) 106 Cal.App.5th 982, 993 (*Los Angeles Deputy Sheriffs*).)

This mandate to bargain in good faith " 'is premised on the belief that collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole. [Citations.] This will be true, however, only if the subject proposed for discussion is amenable to resolution through the bargaining process.' " (*Claremont*, *supra*, 39 Cal.4th at p. 637; see also *Los Angeles Deputy Sheriffs*, *supra*, 106 Cal.App.5th at p. 993.) When an employer asserts that the matter is a fundamental managerial or policy decision and therefore outside the scope of representation, courts apply a three-part inquiry to decide whether section 3505's meet and confer requirement applies. (*Claremont*, at p. 638.)

Where it applies, the duty to bargain generally " ' "requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse." ' " (*Kern County Hospital Authority v. Public Employment Relations Bd.* (2024) 100 Cal.App.5th 860, 877, italics omitted (*Kern County*).) An unlawful unilateral change consists of (1) a change or deviation from the status quo that (2) concerns a matter within the scope of representation and (3) has a generalized effect or continuing impact on represented employees' terms or conditions of employment (4) without adequate advance notice to the union and bargaining in good faith until the parties reached an agreement or a lawful impasse. (*Id*. at p. 878.)

PERB's factual findings "shall be conclusive," so long as they are "supported by substantial evidence on the record considered as a whole." (§ 3509.5, subd. (b); see also *Kern County*, *supra*, 100 Cal.App.5th at p. 877.) " ' "If there is a plausible basis for the

9

Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' " (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 (*Boling*).) We also " 'generally defer to PERB's construction of labor law provisions within its jurisdiction,' " but not when its construction " 'is clearly erroneous.' " (*Id.* at pp. 911–912.) "[C]ourts retain final authority to ' "state the true meaning of the statute." ' " (*Id*. at p. 912.)

Applying these standards of review, we will defer to PERB's factual findings, rejecting the county's contention that they are unsupported by substantial evidence. We will accordingly uphold PERB's determination that the county failed to bargain in good faith when practicable over the effects and implementation of DSW assignments. As for the parties' dispute on purely legal questions, we reject in our independent judgment the county's broad assertion that section 3100 means no DSW assignment can effect a change to an employee's status quo. But PERB's narrowing of the *Claremont* inquiry in determining whether county policy decisions are subject to mandatory bargaining is clearly erroneous. On this sole ground, we will annul PERB's decision and remand the matter for PERB to reconsider its assessment of the county's unilateral policy decisions under a proper application of the Supreme Court's *Claremont* balancing test.

## A.     *The County's DSW Policy Decisions*

The county contends that it was entitled to unilaterally undertake DSW assignments because the assignments (1) did not change the status quo and (2) were beyond the scope of representation. PERB's findings that both the DSW assignments and revision of the DSW policy changed the status quo are supported by substantial evidence. But PERB misapplied the *Claremont* analysis in assessing whether the scope of representation included the foundational decision to assign DSW's to private nursing facilities and motels.

10

### 1. *The DSW Assignment Decisions*

#### a. *The Scope of PERB's Decision*

For the first time at oral argument, PERB conceded that the county's decision to assign workers to private nursing facilities is not subject to mandatory bargaining. It nonetheless defended the breadth of its decision and order on the theory that both merely address the implementation and effects of those policy decisions. But like the county and amici, and like PERB's own response to amici, we read the plain text of PERB's decision, as well as its context, to sweep more broadly.

Our reading tracks the unions' unfair practice charge and the complaint PERB adjudicated. The unions based their unfair practice charge in part on the allegation that their first notice of the county's plans to designate represented employees as DSW's was an April 6, 2020 " '[c]ourtesy [n]otice' " that "County staff will be assigned to the privately owned [skilled nursing facilities] as DSW, and that the County staff would care for the COVID-19 negative patients in the [skilled nursing facility], in order to relieve pressure on the County's acute care facilities." Registered Nurses specifically complained about the county's failure to bargain over the county's antecedent closure or reduction in services of certain county clinics. Among other remedies, the unions sought rescission of "*all* previously[ ]taken unilateral actions." (Italics added.) In turn, PERB's General Counsel alleged in its complaint that the county violated its duty to meet and confer in good faith by its unilateral adoption of a policy—assigning represented employees to private nursing facilities, hotels, and shelters.

Nothing in PERB's decision suggests the more modest reading it lately advances. True, in its decision PERB initially differentiated between an employer's policy-based "assignment decision" and the effects and implementation of such a decision, including that the implementation and effects may be bargainable even where the decision is not. But, without limiting its order to implementation and effects, PERB ordered the county to

11

meet and confer in good faith over "assignments to [private] skilled nursing facilities …

and motels." This contrasts with PERB's order regarding the county decision to scale

back services at certain medical clinics. There, PERB held that the decision to scale back

services was not subject to mandatory bargaining and directed the county only to bargain

over "the effects" of the decision.[8]

And as recently as its answer in this court to the brief of amicus curiae, PERB

maintained that its decision "required [the county] to acknowledge its duty to bargain

regarding its *decision to deploy workers* and bargain as soon as practicable." (Italics

added.) In PERB's view, the county's interest in emergency deployment of workers was

adequately protected by deferring compliance with the duty to bargain to " 'the earliest

practicable time.' "

Given PERB's evolving interpretation of its precedential decision and order, we

will address the application of *Claremont* to the county's threshold decision to assign

DSW's to private nursing facilities and motels and explain why we will hold PERB to its

concession at oral argument.

### b.    *The Status Quo*

The county contends that because all public employees have a duty under

section 3100 to act as DSW's in an emergency, no legitimate DSW assignment can

change the status quo. The county's threshold premise is legally infirm, however, and its

refusal to engage with a meaningful comparison of the employees' pre-emergency

---

[8] PERB asserted at oral argument that because its order does not distinguish the decision to use DSW assignments to deliver new services from the implementation of that decision, the discussion of "DSW assignments" in PERB's decision could be understood as limited to the implementation and effects of those assignments. This is not a reasonable construction of PERB's order, which required the county to meet and confer over "DSW assignments" without limitation but over only "the effects of scaling back services." We accept PERB's representation about the intended scope of its precedential decision and order; annulment and remand will permit PERB to clarify both.

12

assignments and the conditions of their employment as DSW's forecloses the county's alternative suggestion that the specific assignments here were in fact reasonably contemplated within the assigned employees' normal role.

Besides section 3100's designation of public employees as disaster service workers, the county relies on its Emergency Management Ordinance and two employment policies as evidence of the status quo. The ordinance empowers the county executive, as director of emergency services, to "require emergency services of any County … employee." Policies adopted in 2008 and 2014 alerted employees that "they may be assigned to assist in any disaster service activity" protecting public health and safety and preserving lives and property, including in response to a "pandemic." Both policies explained that employees, as part of the county's response to a disaster, could be left to perform their normal job duties or could be assigned to alternative disaster service duties. Both polices included examples of disaster service duties—ranging from "clerical support," "food preparation," and "delivery driving" to "damage assessment" and "security"—but were explicit that these examples were nonexhaustive. Both policies explained that employees would be compensated "based upon" their normal positions.

But nothing in section 3100, county ordinance, or county policy establishes a status quo; taken together, these merely alert employees that the county's disaster response may cause their status quo to change—with no apparent limitation on the extent of that change beyond their superiors' lawful discretion. How statute, ordinance, and policy are operationalized in responding to a disaster and whether this response in fact changes the status quo for affected employees depends on a comparison of baseline conditions for those employees before and after the contemplated disaster service assignments. The county, however, in its maximalist view of section 3100, has not engaged in that comparison.

13

Substantial evidence supports PERB's determination that specific DSW assignments changed the status quo because they were not reasonably comprehended by the general obligation to perform disaster service work when called on.

The county principally contends that it has no obligation to bargain over any disaster service assignment because disaster service assignments of all types are reasonably comprehended by the employee's duty to serve as DSW's if called on.

To be sure, PERB has long recognized that even if an employee has never performed a particular duty, assigning the employee such a duty may not represent a bargainable deviation from the status quo if that duty is " 'reasonably comprehended' within their existing assignment or set of duties." (*Registered Nurses Professional Association v. County of Santa Clara* (2022) PERB Dec. No. 2820-M [46 PERC ¶ 169, pp. 5–6] (*RNPA*); see also *Rio Hondo Faculty Association v. Rio Hondo Community College District* (1982) PERB Dec. No. 0279 [7 PERC ¶ 14036, p. 17].) " '[R]easonably comprehended' is an objective standard that refers to what a reasonable employee would comprehend based on all relevant circumstances, including, but not limited to, past practice, training, and job descriptions." (*RNPA*, at p. 6.) But an employer deviates from the status quo, and is obligated to bargain in good faith, when it creates a new policy or enforces an existing policy in a new way. (*Id.* at p. 5; § 3505.)

It is one thing to know that as a matter of law or employer policy one may have to perform disaster service work in a future emergency as a condition of employment; it is another to know what kind of service the emergency will require. We decline to hold that a failure to forecast the specific services to be required brings an unlimited range of disaster service work within the unsuspecting employee's status quo.[9] As reflected by PERB's findings, the county in the pandemic made a novel decision to use its workforce

_____

[9] Although the county's policies provided some exemplar disaster service activities, the activities here do not fall within those examples.

14

to support new services.  PERB's determination that the DSW assignments changed the status quo is supported by substantial evidence, and we reject the county's contention that this determination turned on a foundational error of law.

The county appears to suggest that the assignments at issue here were sufficiently related to the prior assignments that there was no change in the status quo.  But the county declines to provide "a detailed comparison between an employee's DSW duties and their regular day-to-day duties" on the theory that such a comparison is irrelevant.

To the extent the county has mounted a substantial evidence challenge, it has done so by reframing the findings PERB made in concluding that private nursing facility assignments changed the status quo.  PERB found that such work changed the status quo because employees were supervised by private sector managers under unfamiliar standards and procedures.  These findings are supported by evidence that (1) county nurses shadowed facility-employed nurses as training; (2) doctors at the facilities expected nurses to follow verbal medication orders instead of written medication orders as generally provided by county policy; and (3) nurses felt that the latter deviation from county policy put patient health and their licenses at risk.  What the county disputes, however, is not the existence of this evidence but its relevance—disclaiming county responsibility for any unfamiliar policies at the private nursing facilities and contesting the distinct finding, announced elsewhere in the PERB decision, that nurses had to work at the facilities without county supervision.  But these arguments are at best tangential to the sufficiency of evidence to support the relevant findings.  While the county takes issue with discrete factual statements—about the extent of county supervision of DSW placements or certain differences in work policies as between the private nursing facilities and county facilities—these contentions do not demonstrate error.

Nor did PERB fail to address section 3100, the county ordinance, or the county's DSW policies in addressing whether the private nursing facility assignments were reasonably comprehended in the employees' existing assignments or duties.  PERB

15

discussed each of these matters, including the relevance of "job descriptions," and interpreted job descriptions in the context of the employees' overall role.

### c. *The Scope of Representation and* Claremont

"The scope of representation … include[s] all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment," but "shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.) To distinguish the " 'arguably vague' and 'overlapping' " definition of the scope of representation and its exception, we apply a three-part inquiry: (1) Does the management action have " 'a significant and adverse effect on the wages, hours, or working conditions' " of represented employees? (2) If so, does "the significant and adverse effect arise[] from the implementation of a fundamental managerial or policy decision"? (3) Where these interests of both the employees and management are implicated, "[t]he action 'is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question.' " (*Claremont*, *supra*, 39 Cal.4th at pp. 631, 638.)

The county contends that it was entitled to unilaterally decide to assign DSW's to private nursing facilities and motels, because this was a fundamental managerial or policy decision beyond the scope of union representation. We agree that—as to the threshold decision to deploy represented DSW's to private nursing facilities and motels—PERB erred in applying *Claremont* by refusing to consider the emergency circumstances in its balancing. This error requires us to annul PERB's decision to permit its correction. But we reject county's contention that section 3100 removes the implementation of these DSW assignments from the scope of representation as a matter of law.[10]

_____

[10] Section 3100 grants the county discretion to assign its employees as DSW's but does not address how the county is to exercise that discretion with represented employees

16

In applying *Claremont*, PERB necessarily reached the third-step balancing.[11]  As we have explained, the record and the law supported PERB's conclusion that sending county employees to privately owned nursing facilities and motels in these circumstances had significant and adverse effects on employment conditions.  And accepting PERB's factual findings as to the county's emergency defense, those significant and adverse effects flowed from a fundamental managerial and policy decision that failing to staff private nursing facilities or motels repurposed for emergency housing risked spreading infection and overburdening hospitals.[12]  But at the crucial balancing step, PERB erred by expressly refusing to consider the "emergency characteristics of the situation."  This failure is material to PERB's analysis of the initial decision to assign DSW's to private nursing facilities and motels.

---

under the MMBA.  *Claremont* supplies a framework by which to reconcile a public entity's need for unencumbered decisionmaking in managing its operations—including disaster service assignment under section 3100—with its bargaining obligations under the MMBA.  The county's January 8, 2026 request for judicial notice of dictionary definitions and four lines of legislative history would add nothing to our interpretation of either section 3100 or the MMBA, so we deny it.

[11] In the alternative, PERB stated that it did not need to apply the *Claremont* inquiry because its own precedent adequately established that "material changes to job assignments and duties generally fall within the scope of representation."  Not so.  The decisions PERB invoked are distinguishable in that neither applied a *Claremont* analysis to an analogous context.  (See *RNPA*, *supra*, PERB Dec. No. 2820-M, p. 7; *Cerritos College Faculty Federation, American Federation of Teachers Local 6215 v. Cerritos Community College Dist.* (2022) PERB Dec. No. 2819 [46 PERC ¶ 168, pp. 30–31].)  That job duties and assignments are *generally* within the scope of representation does not resolve whether the county's emergency resort to section 3100 assignments at private nursing facilities and motels was necessarily within the scope of representation under *Claremont*'s balancing inquiry.  Any balancing inquiry is necessarily specific to its context, and if the Legislature or Supreme Court had intended to ensure that material changes to job assignments and duties were categorically within the scope of representation, either could have directed us accordingly.

[12] There is no dispute that these actions were within the county's authority under section 3100.

17

PERB's refusal to consider the emergency circumstances undermines its third-step *Claremont* balancing because it undervalues the county's need for unencumbered decisionmaking in matters of emergency policy. The emergency circumstances at a minimum bear on the third-step consideration of "whether the 'transactional cost of the bargaining process outweighs its value.' " (*Claremont*, *supra*, 39 Cal.4th at p. 638.) PERB articulates no reason why the county's interest in deciding unencumbered how best to ameliorate the spread of infection in the community while preserving hospital capacity is outweighed by any countervailing benefits of bargaining that fundamental policy decision.

A county's authority under section 3100 to assign public employees to perform disaster service activities in a pandemic is no less fundamental than its authority to institute layoffs to manage fiscal constraints. (See *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 264–265, 276 (*Richmond Firefighters*) [distinguishing the threshold decision to reduce the workforce from the implementation and effects of that decision].) We draw a similar distinction here.

But by expressly disregarding "the emergency characteristics of the situation" in assessing whether the disaster service decision was within the scope of representation, PERB failed to consider the county's interest in organizing its services to protect public health in a pandemic. It is not enough to say that the emergency defense allows the bargaining obligation to be postponed until such time as bargaining is practicable: First, this fallaciously assumes the conclusion that the decision was bargainable in the first instance, and places PERB's thumb dispositively on one side of the *Claremont* scale; second, time-sensitivity is but one of the salient emergency characteristics of the situation.[13]

---

[13] No party has challenged PERB's application of section 3504.5 to permit the county to delay bargaining to agreement or impasse until it was practicable to do so.

PERB in its briefing asserted that we must defer to its decision to ignore the "pandemic's effects" in assessing the scope of representation. But our deference to PERB's construction of the MMBA, much like PERB's construction, is limited by Supreme Court precedent, as it is the judiciary that is ultimately responsible for construing the statute. (See *Boling*, *supra*, 5 Cal.5th at p. 911.) In this context, the Supreme Court's recognition in *Claremont* that the employer's need for unencumbered decisionmaking is to be weighed in the balance requires us and PERB alike to consider that need and the circumstances that inform it, including the occurrence of a disaster contemplated by section 3100.[14] We will trust the Legislature to promptly address any concerns about the scope of the *Claremont* balancing by clarifying amendment.

In its ruling, PERB identified no benefit to employer-employee relations from bargaining the county's initial decision to assign DSW's. PERB addressed only benefits from bargaining the implementation and effects of the threshold decision—training, availability of personal protective equipment, and hazard pay. PERB having identified no benefit from requiring bargaining over the initial decision, the *Claremont* balancing

Consistent with that analysis, the county accepts that it had to meet and confer about the bargainable effects of its initial decision to assign DSW's as soon as practicable. We address the county's arguments about the scope of bargainable effects and its compliance with that obligation in a separate section, below.

[14] PERB's reliance on its earlier decision in *Oxnard Federation of Teachers and School Employees, Local 1273 v. Oxnard Union High School District* (2022) PERB Dec. No. 2803 [46 PERC ¶ 110] is misplaced. There, PERB ruled that bargaining over changes to work-from-home policies would not unduly infringe on managerial freedom. (*Oxnard*, at p. 43.) PERB reasoned that even if time was of the essence due to the pandemic, "that consideration [went] to the limitations on bargaining obligations when an emergency compels an employer to act rapidly …; it does not … turn the topic into a non-mandatory subject." (*Ibid*.) But time is only one element of the pandemic policy decision at issue here, which implicated not merely the safety of county employees in the workplace but protection of the public at large and the county's capacity to provide hospital care for those most in need and housing for those least equipped otherwise to maintain protective practices.

19

necessarily tilts in favor of the county's need to decide where and in what capacity to assign DSW's to preserve life in a pandemic. We recognize the unions' "interest in protecting and compensating the essential workers serving the public during a … pandemic." The unions can serve that interest by bargaining over the implementation and effects of the DSW assignments, without bargaining over the fundamental decision to deploy DSW's in the first instance.[15]

PERB emphasizes that its application of an emergency defense means that including the assignment decision within the scope of representation will have a muted impact on the county's decisionmaking because the county will be permitted to make the decision without bargaining to agreement or impasse (or at all) if it is impracticable to do so. But this logic overlooks the correspondingly muted benefit to employer-employee relations when the emergency defense applies. PERB identified nothing to be gained from bargaining over the county's threshold decision to choose one model of DSW deployments over some alternative deployment (or non-deployment), when the public health emergency that compelled the county to choose has already pushed the county to implement that choice.[16] Even if the county had a practicable opportunity to meet and confer with the unions about its decision, PERB has identified no benefit to employer-employee relations that would outweigh the county's need to decide how best to manage public health in a pandemic.

### 2.    *The 2020 Policy*

The county contends that it had no duty to bargain over the April 2020 policy titled "County Employees Serving as Disaster Service Workers," arguing that it did not

---

[15] SEIU and Registered Nurses do not identify any benefit to bargaining as to this threshold decision, as opposed to terms and conditions of employment.

[16] The benefits of even delayed bargaining over the implementation and effects of the initial decision are more apparent, particularly when the assignments continued for weeks and even months.

change the status quo set by the county's 2008 policy of the same name.[17] Under our deferential standard of review, PERB's contrary finding is supported by substantial evidence. (See *Boling, supra*, 5 Cal.5th at p. 912 [discussing judicial deference to PERB factual findings].)

In its decision and on appeal, PERB relies on two features of the 2020 policy—the removal of some language from the 2008 policy and the addition of new language. As we have explained, the 2008 policy included that "employees need to take care of their families first and ensure their safety" with its directive to "follow their department's reporting instructions; be prepared to be assigned to any type of disaster service activity." The 2020 policy omitted this prefatory encouragement and instead added that employees cannot refuse a DSW assignment absent "a legitimate qualifying reason" approved by the county and that the failure to accept or perform a DSW assignment "may lead to discipline, including termination of employment." It was not illegitimate for PERB to infer from these changes that the 2020 policy subordinated what had been employees' "first" responsibility to care for their families to their compliance with DSW assignment on pain of termination.

The county's contention that it did not prohibit employees from taking measures to ensure the safety of their families is beside the point. The change PERB identified is not a prohibition on ensuring family safety but the priority now given to DSW duties. Although the county now characterizes its 2008 policy as only recommending that "employees should ensure the safety of their families upon the declaration of a countywide emergency," the language of the policy (including the use of "need" rather than "should") lends itself to PERB's construction, even if a reasonable trier of fact could reach a different conclusion.

---

[17] PERB also ordered the county to rescind and bargain in good faith over a second April 2020 policy, entitled "Disaster Service Worker County Employees Frequently Asked Questions Sheet COVID-19 Pandemic." The county does not challenge that order.

Nor was PERB required to accept the county's position that the 2020 FAQ was merely guidance. On the face of both the 2008 and 2020 iterations, the FAQ's are a device for explaining the county's policies, including here whether employees may focus on their families' safety over acceptance of a DSW assignment in lieu of their normal duties.

Testimony that the policy was intended only as "additional guidance" does not detract from the sufficiency of the evidence supporting PERB's contrary ruling. If anything, testimony that the new policy "create[d] a systemic procedure … to respond to … emerging needs" and related to "how we would implement the disaster service worker scheme relating to current events" supports PERB's conclusion that this changed the status quo.

We also defer to PERB's determination that the addition of new language about discipline and termination also changed the status quo. Considering this new language alongside the removal of language emphasizing family care, PERB inferred that this modification signaled a shift to a policy of more aggressively disciplining employees who did not comply with DSW assignments. Because this inference is plausible, we will not disturb it. (*Boling*, *supra*, 5 Cal.5th at p. 912.)

We recognize that a statement that work "may" be required, as in the 2008 policy, and that the failure to perform work "may" lead to discipline, as in the later policy, are coextensively vague. Further, PERB acknowledged testimony that, independent of the 2020 DSW policy, county employees could be subject to discipline for refusing to carry out tasks assigned to them. We agree that confronted with those facts, one could reasonably infer that the county changed the framing of its policy, but not the policy itself. Even so, recognizing that the county elected to change its policy language, we are not persuaded to reject the factual inferences that PERB drew from this record.

Because the county's challenge to PERB's decision and order as to the 2020 DSW policy is limited to PERB's factual findings, we will not reach PERB's conclusion that

22

this change in the status quo was subject to mandatory bargaining, and we express no opinion on this point. Because we must annul PERB's decision based on its *Claremont* error in addressing the county's threshold decision to assign DSW's under section 3100, we note for the parties' guidance on remand that PERB's determination that the 2020 DSW policy was subject to mandatory bargaining considered only "disciplinary issues as they exist in general, not during an emergency."

**B.    *Implementation and Effects of the DSW Policy Decisions***

Our ruling that PERB materially erred in assessing the scope of the representation does not extend to the implementation and effects of the DSW policy decisions. In the layoff context, our Supreme Court explained that while a decision to use layoffs to reduce labor costs is not subject to mandatory bargaining, employees are entitled to bargain "over the implementation of the decision, including the number of employees to be laid off, and the timing of the layoffs, as well as the effects of the layoffs on the workload and safety of the remaining employees." (*Richmond Firefighters*, *supra*, 51 Cal.4th at p. 277.) The implementation of the county's DSW assignments is analogous to the implementation of layoffs—the means of effectuating the policy decision touches on issues, such as employee safety and compensation, that PERB found in this case will benefit from the bargaining process. And unlike the county's core policy decision concerning the services to provide in a pandemic, the core implementation constraint imposed by the pandemic was the need to act quickly. Where the need to act quickly is the essence of the argument for unencumbered decisionmaking, we identify no error in PERB's determination that the concern is addressed by PERB's application of the emergency defense. Moreover, even delayed bargaining may provide a substantial benefit to employer-employee relations because these assignments were implemented for an extended period. So we do not disturb PERB's conclusion as it relates to the county's implementation of DSW assignments.

23

Indeed, the county concedes that it had a duty to bargain over certain effects of the DSW assignments at issue here when it was practicable to do so.[18]  But the county disputes which effects are bargainable, contending that PERB erred in including hazard pay and employee selection.  Further, the county asserts that it satisfied as soon as practicable its obligation to meet and confer over bargainable effects.  We reject these claims of error.

### 1.  *Hazard Pay*

PERB viewed hazard pay as an "obvious point[]" for the parties to negotiate, reasoning that existing [memorandum of understanding] provisions on hazard pay did not contemplate assignments to private nursing facilities and motels during a pandemic.  The county contends that PERB erred by disregarding its 2008 DSW policy, which provided that DSW pay will be "based upon [the employees'] normal County positions and may be eligible to receive overtime depending on their classification and hours worked."

Conceding that the 2008 policy forecloses the need for bargaining about compensation only if it is clear and unambiguous as to what pay employees will receive for their work, the county asserts that the "policy is clear on its face as to the compensation employees assigned to DSW activities would receive."  (See *Teamsters Local 856 v. County of Merced* (2020) PERB Dec. No. 2740-M [45 PERC ¶ 29, p. 10] [employer can take unilateral action on matter within the scope of representation if the right to negotiate has been waived through clear and unambiguous contract language].)  But the 2008 policy only rules out the possibility that employees will be paid under a separate compensation scheme for disaster service activities; it does not establish what employees will be paid, including whether hazard pay will be available.  The 2008 policy is thus ambiguous.

---

[18] For example, the county concedes that it was required to bargain training, staffing ratios, PPE, workload, and other safety measures as soon as practicable.

## 2. *Employee Selection*

The county contends that the process for selecting employees is outside the scope of representation for the same reasons that the decision to issue DSW assignments is outside the scope of representation. But even if the decision to deploy DSW's to private nursing facilities and motels is itself exempt from the duty to mandatory bargain, the selection of employees to be deployed was integral to implementation of that policy decision. We discern no error impacting PERB's balancing of the county's need for unencumbered decisionmaking against the benefits of bargaining as it relates to this effect of the county's decision to assign DSW's to support private skilled nursing facilities and motels. As with fiscal layoffs, where "the number and identity of the employees to be laid off" is a managerial decision subject to bargaining (*Richmond Firefighters*, *supra*, 51 Cal.4th at p. 265), we have no basis to disturb PERB's conclusion that the same applies here.

As in the layoff context, the MMBA's core purpose of "improv[ing] personnel management and employer-employee relations" (*County of Sonoma*, *supra*, 80 Cal.App.5th at p. 178) is served here by requiring bargaining over the county's employee selection process (together with other bargainable effects). As to the county's interest in making that selection unencumbered, the county's own election to solicit volunteers even at the height of the pandemic implicitly concedes the benefit of employee participation in deciding who would be subject to these novel and potentially dangerous assignments. Compared with the fundamental policy decision of resorting to DSW assignments, the county's interest in unencumbered decisionmaking over the implementation of that policy decision is lesser, and the benefit to employer-employee relations of bargaining over means of implementation is greater. This benefit remains even where the county's first practicable opportunity to bargain arose only after it unilaterally selected and dispatched employees to private nursing facilities or motels. And the record supplies no basis to infer that PERB's *Claremont* error as to the threshold

25

decision to invoke the DSW policy taints in any way PERB's conclusion that employee selection was among the bargainable effects of that decision.

### 3.　　*Timing*

The county contends that it fulfilled its obligation to meet and confer as soon as practicable because it met with the unions to discuss bargainable effects as early as April 2020. PERB, however, did not find that the county failed to meet with the unions; PERB instead located the breach of the county's duty to bargain in the county's persistent position that the meetings were merely a noncompulsory courtesy. The county does not directly dispute PERB's findings that the county refused to negotiate, believing that negotiation was not required, and that its meetings were no more than a pro forma courtesy. County e-mails from April 2020 denying any "obligation to meet and confer on DSW assignments or enter into sideletters regarding such matters" adequately support these findings. Moreover, the county maintains that the unions were "largely focused on … hazard pay and selection process"—the very issues that the county continues to maintain are "outside the scope" of representation. The county has supplied us with no basis to reject PERB's determination that it refused to bargain in good faith about any aspect of the DSW assignments regardless of whether it had become practicable to do so.

### C.　　*Remedy*

Although we have rejected most of the county's challenges to PERB's decision, PERB's clear error in its application of *Claremont* to county policy changes was material to the decision, considering PERB's factual findings, and to the order, considering the breadth of relief PERB granted. Specifically, the finding that the county violated the MMBA by failing to meet and confer in good faith over "assignments to skilled nursing facilities … and motels"—without limitation to the implementation and effects of those assignments—is infected by clear legal error in the application of *Claremont*. PERB erred in finding that the county was required to meet and confer over whether to assign DSW's to skilled nursing facilities and motels, not in finding that the county was required

26

to meet and confer, when practicable, over which DSW's were assigned and on what terms.

Having identified a material legal error in PERB's analysis, we will annul the decision and return the matter to PERB to enter a new decision and order free from its misapplication of *Claremont*.  (See *San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 867; § 3509.5, subd. (b) [authorizing appellate courts entertaining petitions for a writ of extraordinary relief to set aside the decision or order of the board].)

## III.  DISPOSITION

Public Employment Relations Board (PERB) Decision Number 2876-M is annulled.  The matter is remanded to PERB for further proceedings consistent with the views expressed in this opinion.  Each party shall bear its own costs in this original proceeding.

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.




_____
WILSON, J.




*County of Santa Clara v. Public Employment Relations Board*
H051570